EXHIBIT A

DATED *Effective Sept 1,* 2015
*and Closed Dec. 7 / 2015*

*WITNESS.*

(1)     TAILWIND CAPITAL PARTNERS, INC.

(2)     COBALT COAL LTD.

(3)     US CARBON RESOLUTIONS CORPORATION

SHARE PURCHASE AGREEMENT
relating to

CLINCHCO MET COAL, INC.

(formerly Cobalt Coal Corp Holdings, Inc.)

## CONTENTS

| | | |
|---|---|---|
| 1 | DEFINITIONS AND INTERPRETATION | 1 |
| 2 | SALE AND PURCHASE OF THE SHARES | 6 |
| 3 | CONSIDERATION | 7 |
| 4 | CLOSING | 7 |
| 5 | WARRANTIES AND INDEMNITIES | 7 |
| 6 | TAX | 8 |
| 7 | FURTHER UNDERTAKINGS AND OBLIGATIONS OF THE SELLER | 8 |
| 8 | CONSENTING PARTY APPROVAL | 10 |
| 9 | CONFIDENTIAL INFORMATION | 11 |
| 10 | ONGOING OBLIGATIONS | 12 |
| 11 | ANNOUNCEMENTS | 12 |
| 12 | ASSIGNMENT AND SUCCESSORS IN TITLE | 12 |
| 13 | THIRD PARTY RIGHTS | 12 |
| 14 | NOTICES | 13 |
| 15 | GENERAL | 13 |
| 16 | GOVERNING LAW | 14 |

SCHEDULE 1 ........................................................................................... 15

    Part 1 - The Company ........................................................................ 15

    Part 2 - The Subsidiaries.................................................................... 16

SCHEDULE 2 - CLOSING ...................................................................... 20

SCHEDULE 3 - CONSIDERATION ........................................................ 22

SCHEDULE 4 - WARRANTIES .............................................................. 24

SCHEDULE 5 - TAX INDEMNITY .......................................................... 35

SCHEDULE 6 - LEASED REAL PROPERTY.......................................... 36

SCHEDULE 7 - PERMITS ...................................................................... 37

**DATE**                    2015

**PARTIES**

(1)  **TAILWIND CAPITAL PARTNERS, INC.,** a corporation incorporated and registered in the Province of Alberta, Canada (corporate access #2017738887), whose registered office is at 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 (**Tailwind**);

(2)  **COBALT COAL LTD.,** a limited company incorporated and registered in the Province of Alberta, Canada (corporate access #2014927764), whose registered office is at 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 (the **Seller**); and

(3)  **US CARBON RESOLUTIONS CORPORATION,** a corporation incorporated and registered in the State of Delaware, USA, whose registered office is at 7342 Alabama Highway 117, Flat Rock, Alabama 35966 USA (the **Buyer**).

**IT IS AGREED**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In this agreement, the following definitions will apply:

**Accounts**
the unaudited financial statements of the Company for the period ended on the Accounts Date, comprising the unaudited balance sheet and unaudited profit and loss account together with the notes and cashflow statement relating to them and the directors' report on them;

**Accounts Date**
31 December 2014;

**Agreed Form**
any document in a form agreed between the parties and, for the purpose of identification only, signed or initialled by or on behalf of each of them;

**Business Day**
any day (other than a Saturday, Sunday or public holiday) during which banks in London and the State of Virginia, USA are open for normal business;

**Buyer's Group;**
the Buyer and each subsidiary of the Buyer and Buyer's Group Company shall be construed accordingly;

**Claim**
any one or more claims made by the Buyer for breach of a General Warranty;

**Company**
Clinchco Met Coal, Inc., further details of which are set out in **part 1** of **schedule 1;**

**Closing**
completion of the sale and purchase of the Shares in accordance with this agreement;

**Closing Date**
the date on which Closing occurs pursuant to **clause 4.2;**

**Confidential Information**
all or any information of a secret or proprietary or confidential nature (however stored) and not publicly known which is owned by the Company or which is used in or otherwise relates to the business, customers or financial or other affairs of the Company, including information relating to:

(a)    the business methods, technical processes, corporate plans, management systems, finances, new business opportunities or development projects of the Company;

15750547.3

(b) the marketing or sales of any past or present or future products, goods or services of the Company including customer and supplier names and lists and other details of customers, suppliers, sales targets, sales statistics, market share statistics, prices, market research reports and surveys and advertising and other promotional materials;

(c) future projects, business development or planning, commercial relationships and negotiations;

(d) any trade secrets or other information relating to the provision of any product or service of the Company; or

(e) lists of employees and details of remuneration and benefits paid to those employees;

**Consideration**
the aggregate consideration for the Shares to be paid or satisfied in accordance with **clause 3**;

**Disclosed**
fully, fairly and specifically disclosed in the Disclosure Documents (and not elsewhere) in such manner and with sufficient detail and clarity to enable the Buyer to assess clearly and accurately the scope, nature and impact of the matter disclosed;

**Disclosure Documents**
the two identical bundles of documents in the Agreed Form;

**Encumbrance**
any mortgage, charge (fixed or floating), pledge, lien, option, hypothecation, restriction, right to acquire, right of pre-emption or interest (legal or equitable) including any assignment by way of security, reservation of title, guarantee, trust, right of set off or other third party right or any other security interest having a similar effect howsoever arising;

**Environmental Laws**
all statutes, rules, regulations, statutory instruments, treaties, directives, directions, by-laws, codes of practice, circulars, guidance notes, orders, notices, demands or injunctions of any Governmental Authority or agency or any regulatory or other body, or any common law duty of care in any jurisdiction in relation to Environmental Matters;

**Environmental Licences**
every licence, registration, permit, authorisation, approval, consent or like matter relating to Environmental Matters, which is necessary or desirable in connection with the commencement and continuation of the use of the Leased Real Property or other assets owned, operated or leased by the Company or any process or activity carried on at the Leased Real Property or other assets owned, operated or leased by the Company, including any conditions or limitations imposed on, or any subsequent amendment or alteration made to, any such licence, registration, permit, authorisation, approval or consent;

**Environmental Matters**
any of the following:

(a) the release, emission, entry or introduction of any Relevant Substance into the air including the air within buildings and other natural or man-made structures, whether above or below ground;

(b) the discharge, release or entry of any Relevant Substance into water (whether natural or artificial, above or below ground) including into any river, water course, lake, loch, pond or reservoir or the surface of the river bed or of other land supporting such waters, ground waters (as defined in section 1(12) of the United Kingdom Environmental Protection Act 1990), sewer or the sea;

(c)    the release, deposit, keeping or disposal of any Relevant Substance in or on land, whether or not covered by the sea or other waters;

(d)    the deposit, disposal, keeping, treatment, importation, exportation, transportation, handling, processing, manufacture, collection, sorting or presence of any Relevant Substance;

(e)    any deposit, disposal, keeping, treatment, importation, production or carrying of any waste, including any substance which constitutes scrap material or any effluent or other unwanted surplus substance arising from the application of any process or activity (including making it re-usable or re-claiming substances from it) and any substance or article which requires to be disposed of as being broken, worn out, contaminated or otherwise spoiled;

(f)    nuisance, noise, defective premises, health and safety at work, industrial illness, industrial injury due to environmental factors, environmental health problems, the conservation, preservation and protection of the natural or built environment or of man or any living organisms supported by the environment;

(g)    mining or blasting associated with mining; or

(h)    any other matter whatsoever affecting the environment or any part of it;

**General Warranties**
the statements in **schedule 4, paragraphs 1 to 27** (inclusive);

**Government Authority**
any domestic or foreign government, whether federal, provincial, state, territorial, local, regional, municipal, or other political jurisdiction, and any agency, authority, instrumentality, court, tribunal, board, commission, bureau, arbitrator, arbitration tribunal or other tribunal, or any quasi-governmental or other entity, insofar as it exercises a legislative, judicial, regulatory, administrative, expropriation or taxing power or function of or pertaining to government;

**Group**
the Company and each Subsidiary and **Group Company** shall be construed accordingly;

**Health & Safety Laws**
all applicable statutes, statutory legislation, common law, treaties, regulations, directives, codes of practice and guidance notes (which have legal effect) in force from time to time concerning the health and safety of those who work for the Company whether as employees or otherwise, or are in any way affected by the activities of the Company or by persons working for or on behalf of the Company, including the Mine Safety and Health Act (30 U.S.C. Section 801 et seq.), the Occupational Safety and Health Act (29 U.S.C. Section 651 et seq.) and equivalent state laws of the State of Virginia;

**Health & Safety Matters**
any matters relating to the Company which arise under Health & Safety Laws;

**Initial Consideration**
the sum of US$50,000;

**Intercede**
the right of the Seller to: (i) require that a representative of the Seller be appointed as a director of any Group Company; (ii) require that any director appointed by the Buyer resigns as a director of any Group Company; (iii) inspect (and take copies of) any documents and records of, or in the possession or under the control of, any Group Company directly relating to the relevant breach; (iv) have access to the officers, employees and personnel of any Group Company; and (v) enter upon all parts of the premises of any Group Company and to inspect and examine any activity being undertaken on such premises;

**Leased Real Property**
as defined **schedule 4, paragraph 27**;

**Losses**
any losses (including loss of profits, loss of reputation and consequential losses), claims, judgments, costs (including costs of enforcement and legal costs), damages, awards, charges, demands, proceedings, penalties, fines, expenses and/or any other liabilities incurred or sustained, or which may, directly or indirectly, be incurred or sustained;

**Owned Real Property**
real property and other interests in land other than the Leased Real Property;

**Permits**
franchises, licences, qualifications, authorizations, consents, certificates, registrations, exemptions, waivers, filings, grants, notifications, privileges, rights, orders, judgments, rulings, directives, permits and other approvals, obtained from or required by a Governmental Authority;

**Permitted Encumbrance**
any Encumbrance in favour of Tailwind arising from the Loan Agreement (as defined in **clause 8.1.1**), the Assignment (as defined in **clause 8.1.2**) and the Security Documents (as defined in **clause 8.1.1**) relating to the Cobalt Senior Debt (as defined in **clause 8.1.1**);

**Records**
together:

(a)   accounts, books, ledgers, financial and other records of whatsoever kind of the Company, including all documentation relating to the contracts and employees of the Company, all invoices and other records required for tax purposes, tax records and all lists of customers and suppliers of the Company in each case however stored and howsoever connected to the Company; and

(b)   all technical and sales material of the Company, including plans, technical and sales publications, designs, drawings and any negatives, blocks, plates and other similar material;

**Relevant Substance**
any hazardous, dangerous, toxic, poisonous, noxious, offensive, radioactive, flammable, explosive, infectious or polluting substance, including asbestos, polychlorinated biphenyls or terphenyls (PCBs or PCTs), petroleum (including crude oil any fractions of crude oil and any petroleum produce and distillates), radon gas, batteries and any other substance or waste described or listed in or pursuant to any Environmental Laws as hazardous, dangerous, special, toxic, radioactive, noxious or offensive and any other substance which is included under or regulated by or pursuant to any Environmental Laws relating to matters which come within the scope of the definition of Environmental Matters or anything made using any of those substances, including all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the *National Oil and Hazardous Substances Pollution Contingency Plan*, 40 C.F.R. § 300.5;

**Seller's Group;**
the Seller and each subsidiary of the Seller and Seller's Group Company shall be construed accordingly;

**Shares**
90 common shares of US$1 each in the capital of the Company, comprising 90% of the share capital of the Company;

**Subsidiaries**
(a)   Cobalt Coal, LLC, registered number 5391495-1;

(b)     KMH Energy Corporation, registered number Virginia ID #0699095-6;

(c)     Ken Energy Corporation, registered number Virginia ID #07381189; and

(d)     Mill Creek Mining Inc., registered number Virginia ID #0762467-9,

brief details of each of which are set out in **part 2 of schedule 1**;

**Tax**
has the meaning given in **schedule 5**;

**Tax Warranties**
the statements in **schedule 4, paragraph 28**;

**Technical Information**
all data, formulae, techniques, trade secrets, expertise, proprietary knowledge, know-how, designs, drawings, recipes, specifications, instructional materials and other such information, of whatever nature, used by the Company in connection with its business;

**US$**
United States dollars, being the lawful currency for the time being of the United States of America; and

**Warranties**
the General Warranties and the Tax Warranties.

1.2     In this agreement, a reference to:

1.2.1     a clause or schedule is, unless otherwise stated, a reference to a clause of or a schedule to, this agreement;

1.2.2     a paragraph is, unless otherwise stated, a reference to a paragraph of a schedule;

1.2.3     a statutory provision includes a reference to that statutory provision as replaced, modified or re-enacted from time to time and any subordinate legislation made under that statutory provision from time to time, in each case whether before or after the date of this agreement and references to laws include any statute, law, ordinance, rule, regulation, judgment, decree, order, injunction, writ, permit or license;

1.2.4     any English statutory provision or English legal term for any action, remedy, method of judicial proceeding, document, legal status, court, official or any other legal concept or thing shall, in respect of any person incorporated or resident in any jurisdiction other than England and Wales, be deemed to refer to and include any equivalent or analogous action, remedy, method of judicial proceeding, document, legal status, court, official or other legal concept or thing or what most nearly approximates in that jurisdiction to the relevant English statutory provision or English legal term;

1.2.5     any Virginian or United States statutory provision or Virginian or United States legal term for any action, remedy, method of judicial proceeding, document, legal status, court, official or any other legal concept or thing shall, in respect of any person incorporated or resident in any jurisdiction other than Commonwealth of Virginia, USA, be deemed to refer to and include any equivalent or analogous action, remedy, method of judicial proceeding, document, legal status, court, official or other legal concept or thing or what most nearly approximates in that jurisdiction to the relevant Virginian or United States statutory provision or Virginian or United States legal term;

1.2.6     a "subsidiary" includes a reference to a "subsidiary" and a "subsidiary undertaking" (each as defined in the United Kingdom Companies Act 2006) and a reference to a "holding company" includes a reference to a "holding

company" and a "parent undertaking" (each as defined in the United Kingdom Companies Act 2006);

1.2.7   a person includes a reference to an individual, body corporate, association, Governmental Authority, state, agency of state or any undertaking (whether or not having a legal personality and irrespective of the jurisdiction in or under the law of which it was incorporated or exists);

1.2.8   a party means a party to this agreement and includes its permitted assignees and/or the successors in title to substantially the whole of its undertaking and, in the case of an individual, to his estate and personal representatives;

1.2.9   a company (other than the "Company") shall be construed so as to include any company, corporation or other body corporate, wherever and however incorporated or established;

1.2.10   writing includes, subject to **clause 14.4**, any mode of reproducing words in a legible and non-transitory form; and

1.2.11   this agreement or any provision of this agreement or any other document are to this agreement, that provision or that document as in force for the time being and as amended from time to time in accordance with the terms of this agreement or that document or with the agreement of the relevant parties (as the case may be).

1.3   The schedules form part of this agreement and have the same effect as if expressly set out in the body of this agreement and shall be interpreted and construed as though they were set out in this agreement.

1.4   The contents table and headings in this agreement are for convenience only and do not affect the interpretation or construction of this agreement.

1.5   Words importing the singular include the plural and vice versa and words importing a gender include every gender.

1.6   The words "other", "include", "including" and "in particular" do not limit the generality of any preceding words and any words which follow them shall not be construed as being limited in scope to the same class as the preceding words where a wider construction is possible.

1.7   Any question as to whether a person is connected with another shall be determined in accordance with section 1122 of the United Kingdom Corporation Tax Act 2010 (except that in construing section 1122 "control" has the meaning given by section 1124 or section 450 of the United Kingdom Corporation Tax Act 2010 so that there is control whenever section 1124 or 450 requires) which shall apply in relation to this agreement as it applies in relation to the United Kingdom Corporation Tax Act 2010.

1.8   Where in this agreement any party gives an indemnity in favour of another party then, subject as expressly provided otherwise in this agreement, the obligation of the indemnifying party shall be to make the relevant payment in full on demand and without any set-off, counterclaim or other deduction.

1.9   Unless specified otherwise, or where the context otherwise requires, a reference to the "Company" in this agreement shall be deemed to include a reference to each Group Company so that, for the avoidance of doubt but without any limitation, the Warranties shall be given in respect of and in relation to each Group Company.

## 2.   SALE AND PURCHASE OF THE SHARES

2.1   The Seller shall sell with full title guarantee and free from any Encumbrance (other than the Permitted Encumbrance), and the Buyer shall buy, the Shares.

2.2   Title to, beneficial ownership of and any risk attaching to the Shares shall pass to the Buyer on Closing and the Shares shall be sold and purchased together with all rights and benefits attached to or accruing to them at, or at any time after, Closing.

2.3   The Seller:

2.3.1      undertakes to procure that any right of pre-emption over any of the Shares which may be vested in any other person is waived; and

2.3.2      covenants with the Buyer that the Shares are fully paid and constitute 90% of the share capital of the Company.

2.4    The Buyer shall not be required to complete the purchase of any of the Shares unless all of the Shares are transferred at the same time.

2.5    The Seller shall deliver to the Buyer the Disclosure Documents on the date of this agreement.

3.    **CONSIDERATION**

3.1    The Consideration shall be as set out in **schedule 3**.

3.2    Unless otherwise agreed in writing between the parties, any sum due from one party to another under any provision of this agreement shall be paid by telegraphic transfer of funds.

4.    **CLOSING**

4.1    Subject to **clause 4.3**, Closing shall take place at the office of the Seller within 30 days of the date of this agreement, or such other date as may be agreed between the Seller and the Buyer, when each of the matters set out in **schedule 2** shall occur.

4.2    Upon completion of the matters referred to in **schedule 2**, the Buyer shall pay the Initial Consideration in accordance with **schedule 3**.

4.3    If, prior to Closing, there is:

4.3.1      any inaccuracy of or any breach by the Seller of, any representation or Warranty of the Seller contained in this agreement; and

4.3.2      any breach or non-performance by the Seller and/or Tailwind of any covenant or other obligation to be performed by it that is contained in this agreement,

the Buyer shall be entitled to terminate this agreement and each party's further rights and obligations under this agreement shall immediately terminate provided that:

4.3.3      it does not affect a party's accrued rights, liabilities and obligations at the date of termination; and

4.3.4      the obligations of the parties under **clauses 9, 11 to 16** shall remain in full force and effect

5.    **WARRANTIES AND INDEMNITIES**

5.1    The Seller warrants and represents to the Buyer in the terms of the Warranties. Each of the Warranties is deemed to be repeated by the Seller at all times up to and including Closing and, for this purpose, reference in a Warranty to the "date of this agreement" is to be construed as a reference to the Closing Date.

5.2    The Warranties are subject only to any matter which is Disclosed.

5.3    The Seller acknowledges that the Buyer is entering into this agreement in reliance on each of the Warranties, which has also been given as a representation with the intention of inducing the Buyer to enter into this agreement.

5.4    The Seller waives and may not enforce any right which it may have in respect of any misrepresentation, inaccuracy or omission in or from any information or advice supplied or given by the employees or officers of the Company for the purpose of assisting the Seller to make a representation or give a Warranty or prepare the Disclosure Documents.

5.5    Each of the Warranties (and each sub-paragraph within each Warranty) shall be interpreted as a separate and independent warranty so that the Buyer shall have a separate claim and right of action in respect of every breach of each Warranty. Each Warranty shall be construed independently and, except where this agreement provides otherwise, is not limited by the terms of any other Warranty or any other provision of this agreement.

5.6    Unless otherwise specified, where any Warranty refers to the knowledge, information, belief or awareness of the Seller (or any similar expression), the Seller shall be deemed to have

such knowledge, information, belief and awareness as the Seller would have obtained had it made all due and careful enquiries into the subject matter of that Warranty (including enquiries of the directors and officers) and the knowledge, information, belief and awareness of the Seller shall be deemed to include the knowledge of the directors and officers of the Company.

5.7   Without limiting the rights of the Buyer or its ability to claim damages on any basis, if there is a breach of Warranty or any of the Warranties is untrue or misleading, and:

5.7.1   the Company incurs or becomes subject to a liability or an increase in any liability which it would not have incurred or been subject to had the breach not occurred; or

5.7.2   the value of any asset of the Company is less or becomes less than the value would have been had the breach not occurred,

then the Seller undertakes to the Buyer (for itself and as trustee of the benefit of this **clause 5.7** for the Company) to pay to the Buyer a sum equal to:

5.7.3   the liability, increased liability or reduction in the value of the asset (as appropriate); or

5.7.4   the reduction in the value of the Shares caused by the breach.

5.8   Without prejudice to any other right or remedies available to the Buyer, the Seller shall indemnify the Buyer and the Company against all Losses which the Buyer or the Company incurs or suffers, directly or indirectly, in any way whatsoever, as a result of:

5.8.1   Taxes payable by the Company for, or arising from, all periods on or before the Closing Date;

5.8.2   its former ownership of the shares of C&B Coal LLC (dissolved), Westchester Coal GP (sold) or Westchester Coal LP (sold);

5.8.3   the Loan Agreement (as defined in **clause 8.1.1**), the Assignment (as defined in **clause 8.1.2**), the Security Documents (as defined in **clause 8.1.1**) and the Discharges (as defined in **clause 8.2.4**) and any other document or thing relating to the Cobalt Senior Debt (as defined in **clause 8.1.1**);

5.8.4   any inaccuracy of or any breach by the Seller   of, any representation or Warranty of the Seller contained in this agreement; and

5.8.5   any breach or non-performance by the Seller and/or Tailwind of any covenant or other obligation to be performed by it that is contained in this agreement.

5.9   Any payment required to be made by the Seller pursuant to this **clause 5** shall be deemed to be a reduction in the Consideration and if already paid in full, paid in cash.

5.10   The Seller shall not be liable for a Claim unless the Buyer gives the Seller notice of such Claim within a period of two years of Closing.

5.11   The aggregate liability of the Seller for all Claims shall not exceed US$800,000.

5.12   In **clause 5.8**, any reference to the Buyer shall include any Buyer's Group Company (from time to time) and any reference to the Company shall include any Group Company and other subsidiaries (from time to time).

6.   **TAX**

The provisions of, inter alia, **schedule 5** shall apply.

7.   **FURTHER UNDERTAKINGS AND OBLIGATIONS OF THE SELLER**

7.1   **Waiver of claims**

The Seller confirms that at the date of this agreement:

7.1.1   neither it nor any Seller's Group Company nor any other person connected with it has any claim against the Company on any account whatsoever;

7.1.2   there are no agreements or arrangements under which the Company has any actual, contingent or prospective obligation to or in respect of the Seller, any Seller's Group Company or any other person connected with it (other than the Permitted Encumbrance); and

7.1.3   any claim which the Seller or any other person connected with the Seller has against the Company is waived in full, any obligation owed to the Seller, any Seller's Group Company or any such connected person by the Company is released and the Seller indemnifies the Buyer and the Company against all Losses which the Buyer or the Company incurs or suffers, directly or indirectly, in any way whatsoever in connection with any such claim or obligation.

## 7.2   Further assurance

7.2.1   The Seller covenants (and shall procure that any Seller's Group Company and any other person shall covenant) with the Buyer that it will at its own cost do everything possible to give the Buyer full and unrestricted legal and beneficial title to the Shares and to give effect to the provisions of this agreement including, on receiving the Buyer's request:

(a)   doing and executing, or arranging for the doing and executing of, each act, document and thing necessary to implement this agreement; and

(b)   giving to the Buyer all information it possesses or to which it has access relating to the Company's business and allowing the Buyer to copy any document containing that information.

7.2.2   Immediately following Closing, the Seller shall (and shall procure that any Seller's Group Company and any other person shall) send to the Buyer at its registered office for the time being all records, correspondence, documents, files, memoranda and other papers belonging to the Company and which are not located at the Leased Real Property or delivered at Closing (whether or not such documents are referred to in **schedule 2**).

## 7.3   Dealing with Shares pending registration

7.3.1   The Seller undertakes to the Buyer that for so long as it remains the registered holder of any of the Shares after Closing it will:

(a)   hold the Shares and the dividends and other distributions of profits or surplus or other assets declared, paid or made in respect of the Shares after Closing and all rights arising out of or in connection with the Shares in trust for the Buyer;

(b)   deal with and dispose of the Shares and all such dividends, distributions and rights as the Buyer may direct;

(c)   vote at all meetings which it is entitled to attend as the registered holder of the Shares in such manner as the Buyer shall direct; and

(d)   execute all instruments of proxy or other documents which the Buyer may require to enable the Buyer to attend and vote at any such meeting.

7.3.2   For the purpose of giving effect to **clause 7.3.1**, the Seller appoints the Buyer (acting by any of its directors from time to time) to be its attorney in its name and on its behalf to exercise all or any of the rights in relation to the Shares as the Buyer in its absolute discretion sees fit from Closing to the day on which the Buyer or its lawful nominee is registered in the register of members of the Company as the holder of the relevant Shares, including:

(a)   receiving notice of, attending and voting at a general meeting, class meeting or other meeting of the Company;

(b)   completing and returning any meeting requisition, form of proxy, consent to short notice, written resolution or other document required to be signed by the registered holder of the Shares;

(c)    dealing with, and giving directions as to, any moneys, securities, benefits, documents, notices or other communications (in whatever form) arising by right of the Shares or received in connection with the Shares from the Company or any other person; and

(d)    executing, delivering and doing all deeds, instruments and acts in the Seller's name as may be done in the Seller's capacity as the registered holder of the Shares,

and for that purpose the Seller consents to the Company sending any written resolutions, notices or other communications in respect of the Shares registered in its name to the Buyer. The power of attorney granted by this **clause 7.3.2** is granted by the Seller to secure the interest of the Buyer in the Shares and, accordingly, shall be irrevocable.

8.    **CONSENTING PARTY APPROVAL**

8.1    Tailwind and the Seller each confirm that:

8.1.1    Sterling Holdings (International) PLC (**Sterling**), pursuant to a master loan agreement dated 20 January 2013 (**Loan Agreement**), advanced the sum of US$1,824,000 to Seller as a senior debt facility (the **Cobalt Senior Debt**). Pursuant to the Loan Agreement, Sterling was granted security for the Cobalt Senior Debt (the **Security Documents**);

8.1.2    Tailwind, via an acquisition agreement dated 12 March 2014, acquired Sterling's entire interest in the Cobalt Senior Debt and the Security Documents (the **Assignment**);

8.1.3    Tailwind is supportive of the transactions contemplated by this agreement provided that the Seller agrees that 100% of all payments made by the Buyer to the Seller are firstly paid to Tailwind until the Cobalt Senior Debt has been paid in its entirety, in accordance with **clause 8.2**; and

8.1.4    the principal amount of the Cobalt Senior Debt was approximately US$2,088,297 as at 20 January 2015 (with interest accruing on that balance at a rate of 10% per annum).

8.2    In consideration of **clause 8.1**:

8.2.1    the Seller hereby agrees that all payments made to it by the Buyer in accordance with this agreement shall be forwarded by the Seller to Tailwind immediately upon receipt and applied by Tailwind to the repayment of the Cobalt Senior Debt (together with interest thereon) until the principal amount of the Cobalt Senior Debt, together with interest thereon, has been fully repaid;

8.2.2    at the sole discretion of the Buyer exercisable from time to time, the Seller and Tailwind agree that the Buyer may direct any payments to be made by the Buyer to the Seller in accordance with this agreement to be instead made directly to Tailwind (rather than the Seller in accordance with **clause 8.2.1**) and applied by Tailwind to the repayment of the Cobalt Senior Debt (together with interest thereon) until the principal amount of the Cobalt Senior Debt, together with interest thereon, has been fully repaid and the Seller agrees that any such payments shall be a valid, full and proper discharge and release of any obligation of the Buyer to make such payments to the Seller;

8.2.3    Tailwind agrees to provide a statement of the principal amount outstanding of the Cobalt Senior Debt (together with interest thereon) to the Buyer within 30 days of receipt of each and every payment from the Buyer pursuant to **clause 8.2.2** and also agrees, upon written request from the Buyer at any time and from time to time, to provide a statement to the Buyer of the principal amount outstanding of the Cobalt Senior Debt (together with interest thereon) effective on the date requested in the written request from the Buyer;

8.2.4    Tailwind agrees to provide fully executed security discharges, where Tailwind shall have no recourse to any of the Seller, the Buyer, the Company, the

Subsidiaries or any Buyer's Group Company (from time to time) in relation to the Loan Agreement, the Assignment, the Security Documents, the Cobalt Senior Debt (including the principal amount together with interest thereon) and the Permitted Encumbrance, and there shall be a valid, full and proper discharge and release of the Security Documents, the Permitted Encumbrance and any obligation to repay the Cobalt Senior Debt (including the principal amount together with interest thereon) ("**Discharges**") at Closing in the form agreed by the Buyer with such Discharges to be held in trust by the Buyer's counsel under the trust condition that the Discharges may not be released to the Buyer or acted upon until no principal amount of the Cobalt Senior Debt (together with interest thereon) is outstanding;

8.2.5 Tailwind consents to the provisions of this **clause 8** by executing this agreement and further confirms that, upon no principal amount of the Cobalt Senior Debt (together with interest thereon) being outstanding, it shall have no recourse to any of the Seller, the Buyer, the Company, the Subsidiaries or any Buyer's Group Company (from time to time) in relation to the Loan Agreement, the Assignment, the Security Documents, the Cobalt Senior Debt (including the principal amount together with interest thereon) and the Permitted Encumbrance, and that there shall be a valid, full and proper discharge and release of the Security Documents, the Permitted Encumbrance and any obligation to repay the Cobalt Senior Debt (including the principal amount together with interest thereon) and Buyer's counsel shall be authorised to release and the Buyer shall be authorised to utilise and act upon the Discharges as it sees fit;

8.2.6 Tailwind, the Seller and any Seller's Group Company (from time to time) agrees to, and to use its best endeavours to procure that any necessary third party shall, promptly execute and deliver such documents and perform such acts and do such things as may be reasonably required by the Buyer or any Buyer's Group Company (from time to time) for the purpose of giving full effect to this agreement, including the Discharges under this **clause 8.2**;

8.2.7 Tailwind irrevocably consents to and approves of the transactions contemplated by this agreement, including the sale of the Shares by the Seller to the Buyer; and

8.2.8 Tailwind warrants and represents to the Seller and the Buyer in the terms of **paragraph 1 of schedule 4** on the basis that such paragraph is repeated here and all references to "the Seller" are replaced with "Tailwind".

9. **CONFIDENTIAL INFORMATION**

9.1 The Seller undertakes with the Buyer (for itself and for the benefit of the Company) that it will:

9.1.1 not use or disclose to a person Confidential Information it has or acquires; and

9.1.2 make every effort to prevent the use or disclosure of Confidential Information.

9.2 The Seller shall procure that each Seller's Group Company (from time to time) complies with **clause 9.1**.

9.3 **Clause 9.1** does not apply to:

9.3.1 disclosure of Confidential Information to a director, officer or employee of the Buyer or the Company whose function requires him to have the Confidential Information;

9.3.2 use or disclosure of Confidential Information required to be used or disclosed by law or by any Governmental Authority or regulatory body but only to the extent required by law;

9.3.3   disclosure of Confidential Information to an adviser for the purpose of advising the Seller but only on terms that **clause 9.1** applies to use or disclosure by the adviser; or

9.3.4   Confidential Information which becomes publicly known except by a breach of **clause 9.1**.

## 10.   ONGOING OBLIGATIONS

10.1   In the event that an instalment of the Consideration is not paid when due and payable in accordance with **schedule 3**, the Buyer shall pay such overdue instalment within 30 Business Days of a notice from the Seller to the Buyer requesting such payment.

10.2   The Buyer covenants with the Seller that, during the period commencing on the Closing Date and ending on the date of payment of the last instalment of the Consideration in accordance with **schedule 3**:

10.2.1   the Buyer shall and shall procure that, so far as it is able, the Subsidiaries shall comply with the terms of the Leased Real Property and the Permits; and

10.2.2   in respect of the Subsidiaries that hold the Permits or Leased Real Property, the Buyer shall use its reasonable endeavours to not permit any Encumbrance (other than the Permitted Encumbrance) to be placed against such Subsidiary.

10.3   In the event that the Buyer breaches any of **clauses 10.1 or 10.2**, which breach is capable of remedy and has not been remedied to the reasonable satisfaction of the Seller within 180 Business Days of a notice from the Seller to the Buyer requesting such remedy, the Seller shall have the right to Intercede in relation to such breach until such breach is remedied by the Seller (using its reasonable endeavours) to the reasonable satisfaction of the Seller. In the event that the Seller is required to Intercede, the Seller shall be entitled to do so immediately after the extended 180 day cure period contemplated herein has expired and the Seller shall be entitled to rely on injunctive relief, if required, to enforce the provisions of this **clause 10.3**.

10.4   If the Seller exercises its right to Intercede in respect of a breach and that intercession continues, without interruption, for two years in respect of that breach and provided that the Seller has used its reasonable endeavours to remedy that breach and is not itself in breach of this agreement, the Seller may, within 30 Business Days of the expiry of such two year period by notice from the Seller to the Buyer, require the Buyer to and the Buyer agrees to use its reasonable endeavours to transfer the Shares back to the Seller for no consideration and no further Consideration shall be paid by the Buyer to the Seller in accordance with this agreement.

## 11.   ANNOUNCEMENTS

The Seller shall not make or authorise any public announcement or other communication or circular concerning the terms of any matter contemplated by or ancillary to this agreement without the prior written consent of the Buyer unless it is required to do so by any Government Authority but only to the extent required by law.

## 12.   ASSIGNMENT AND SUCCESSORS IN TITLE

12.1   No party shall assign, transfer, charge, make the subject of a trust or deal in any other manner with this agreement or any of its rights under this agreement or purport to do any of the same without the prior written consent of the other party.

12.2   This agreement shall be binding upon and shall survive for the benefit of the personal representatives and successors-in-title of each party.

## 13.   THIRD PARTY RIGHTS

13.1   Subject to **clause 13.2**, a person who is not a party to this agreement (other than the employees or officers of the Company pursuant to **clause 5.4**) shall have no rights to enforce or rely on a provision of this agreement. No party to this agreement may hold itself out as trustee of any rights under this agreement for the benefit of any third party unless specifically provided for in this agreement.

13.2    The Company, any Group Company and other subsidiaries (from time to time) and any Buyer's Group Company (from time to time), any person to whom the benefit of any provision of this agreement is assigned in accordance with **clause 12.1** and each person falling within the category of persons described in **clause 12.2** is entitled to enforce any term of this agreement which confers (expressly or impliedly) any benefit on any such person.

13.3    The employees and officers of the Company may each enforce the provisions of **clause 5.4**.

14.     **NOTICES**

14.1    Any notice given pursuant to this agreement shall be in writing signed by, or on behalf of, the person issuing the notice. Any notice shall be delivered by hand, or by prepaid recorded delivery first class post (or by registered airmail in the case of an address for service outside the United Kingdom) to its registered office address for the time being, or, in relation to any party, such other address for service in the United Kingdom as that party may from time to time notify to the others, being at the date of this agreement in respect of the Buyer:

        16a Gashouse Lane
        High Street
        Wetherby
        West Yorkshire
        LS22 6LT
        United Kingdom

14.2    In the absence of evidence of earlier receipt, a notice served in accordance with **clause 14.1** shall be deemed to have been received:

        14.2.1    if delivered by hand, at the time of actual delivery to the address referred to in **clause 14.1**;

        14.2.2    if delivered by prepaid recorded delivery first class post, two Business Days from the date of posting;

        14.2.3    if delivered by registered airmail, five Business Days from the date of posting; and

        14.2.4    if delivered by fax, upon receipt of confirmation that the notice has been correctly transmitted.

14.3    If deemed receipt under **clause 14.2** occurs on a day which is not a Business Day or after 5.00 pm on a Business Day, the relevant notice shall be deemed to have been received at 9.00 am on the next Business Day.

14.4    For the avoidance of doubt, notice given under this agreement shall not be validly served if sent by e-mail.

15.     **GENERAL**

15.1    Except where this agreement provides otherwise, each party shall pay its own costs (including in relation to financial, accounting and legal advice) incurred in relation to the negotiation, preparation, execution and performance of this agreement and the matters referred to in this agreement.   No interest shall be payable on the balance of the Consideration not yet paid by the Buyer.

15.2    This agreement, together with any documents in the Agreed Form and all documents entered into or to be entered into pursuant to the terms of this agreement, constitutes the entire agreement between the parties with respect to all matters referred to in this agreement. This agreement supersedes and extinguishes all previous agreements between the parties relating to such matters.

15.3    No variation to this agreement shall be effective unless made in writing and signed by or on behalf of all the parties to this agreement. The Buyer and the Seller shall not be required to obtain the consent of the Company or any other third party on whom a benefit is conferred under this agreement to the termination or variation of this agreement or to the waiver or settlement of any right or claim arising under it.

15.4    Each provision of this agreement is severable and distinct from the others. If at any time any provision of this agreement is or becomes unlawful, invalid or unenforceable to any extent or

in any circumstances for any reason, it shall to that extent or in those circumstances be deemed not to form part of this agreement but (except to that extent or in those circumstances in the case of that provision) the legality, validity and enforceability of that and all other provisions of this agreement shall not be affected in any way.

15.5    If any provision of this agreement is found to be unlawful, invalid or unenforceable in accordance with **clause 15.4** but would be lawful, valid or enforceable if some part of the provision were deleted, the provision in question shall apply with such modifications as may be necessary to make it lawful, valid or enforceable.

15.6    The failure or delay in exercising a right or remedy provided by this agreement or by law does not constitute a waiver of that (or any other) right or remedy. No single or partial exercise, or non-exercise or non-enforcement of any right or remedy provided by this agreement or by law prevents or restricts any further or other exercise or enforcement of that (or any other) right or remedy.

15.7    The Buyer's rights, powers and remedies contained in this agreement are cumulative and not exclusive of any rights, powers and remedies provided by law.

15.8    Except to the extent that they have been performed or where this agreement provides otherwise, the obligations contained in this agreement remain in force after Closing.

15.9    If any amount payable by the Seller to the Buyer under this agreement is subject to Tax in the hands of the Buyer or is subject to any deduction or withholding required by law to be made, the Seller shall pay to the Buyer with such amount such additional amount as is required to put the Buyer in the position it would have been in had such sum not been subject to Tax or to the deduction or withholding.

15.10   Nothing in this agreement shall apply to exclude or limit the liability of the Seller to the extent that a Claim or any other claim under this agreement arises by reason of any fraud or fraudulent misrepresentation or dishonest, reckless or wilful misconduct or omission by or on behalf of the Seller.

15.11   This agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original. All the counterparts shall together constitute one and the same agreement, which shall be deemed executed when counterparts executed by all of the parties to this agreement are delivered.

15.12   The Buyer may deduct from and set-off against any payment due from the Buyer to the Seller under this agreement any amount in respect of any claim by the Buyer or the Company under this agreement which is subsisting and has not been settled in full by the Seller at the time the relevant payment is due to be paid by the Buyer.

## 16.    GOVERNING LAW

16.1    This agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Virginia, USA. Non-contractual obligations (if any) arising out of or in connection with this agreement (including its formation) shall be governed by the laws of the Commonwealth of Virginia, USA.

16.2    The parties agree to submit to the non-exclusive jurisdiction of the   courts of the Commonwealth of Virginia, USA in relation to any claim or matter (whether contractual or non-contractual) arising under this agreement.

**THE PARTIES** have executed this agreement as a deed and delivered it on the date first set out above

SCHEDULE 1

Part 1 - The Company

| | |
|---|---|
| **Name** | **Clinchco Met Coal, Inc.** |
| **Registered number** | **2247-609** |
| **Previous names** | Cobalt Coal Corp Holdings, Inc. |
| **Date of incorporation** | 7 January 2011 |
| **Place of incorporation** | West Virginia, USA |
| **Registered office address** | 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 |
| **Issued Share capital** | 100 common stock shares registered as follows: <br><br> **Shareholder**      **No. of shares** <br> Cobalt Coal Ltd.      100 |
| **Directors** | Al Kroontje |
| **Accounting reference date** | 31 December 2014 |
| **Last accounts made up to** | 31 December 2014 |
| **Last annual return made up to** | 10 February 2015 |
| **Auditors** | None |
| **Bank** | None |
| **Charges** | Permitted Encumbrance |

Part 2 - The Subsidiaries

| Name | Cobalt Coal, LLC | |
|---|---|---|
| Registered number | S391495-1 | |
| Previous names | None | |
| Date of incorporation | 20 January 2012 | |
| Place of incorporation | Virginia, USA | |
| Registered office address | 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 | |
| Issued Share capital | Two membership units, registered as follows: | |
| | **Member** | **No. of membership units** |
| | Clinchco Met Coal, Inc. | 2 |
| Bank | Account Name: Cobalt Coal, LLC<br>Account Number: 61000042<br>Bank Route Number: 051404684<br>Date Opened: 9 May 2012<br>TIN: 46-0906372 | |
| | Branch Office:<br>Miners Exchange Bank<br>5575 Bobby Hicks Highway<br>Johnson City, TN 37615<br>(423) 477-3800 | Main Office:<br>Miners Exchange Bank<br>P.O. Box 1197<br>Coeburn, Virginia 24230<br>(276) 395-2230 |
| Charges | Permitted Encumbrance | |
| Federal Tax Identification Number | 46-0906372 | |

| Name | KMH Energy Corporation |
|---|---|
| Registered number | Virginia ID #0699095-6 |
| Previous names | None |
| Date of Incorporation | 26 August 2008 |
| Place of incorporation | Richmond, Virginia, USA |
| Registered office address | 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 |
| Issued Share capital | 600 common stock shares, registered as follows:<br><br>**Shareholder**       **No. of shares**<br>Cobalt Coal, LLC       600 |
| Directors | Kenneth L. DeWyn<br>Al J. Kroontje |
| Last annual return made up to | 22 August 2013 |
| Bank | Account Name:  K.M.H. Energy Corporation<br>Account Number:  20435<br>Bank Route Number:  051404684<br>Date Opened:  9 July 2012<br>TIN:  54-1322719<br><br>Branch Office:<br>Miners Exchange Bank<br>5575 Bobby Hicks Highway<br>Johnson City, TN  37615<br>(423) 477-3800     Main Office:<br>Miners Exchange Bank<br>P.O. Box 1197<br>Coeburn, Virginia 24230<br>(276) 395-2230 |
| Charges | Permitted Encumbrance |
| Federal Tax Identification Number | 54-1322719 |

| Name | Ken Energy Corporation |
|---|---|
| Registered number | Virginia ID #07381189 |
| Previous names | None |
| Date of incorporation | 26 August 2008 |
| Place of incorporation | Virginia |
| Registered office address | 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 |
| Issued Share capital | 200 common shares, registered as follows:<br><br>**Shareholder**　　　　　　**No. of shares**<br>Cobalt Coal, LLC　　　　　200 |
| Directors | Kenneth L. DeWyn<br>Al J. Kroontje |
| Bank | None |
| Charges | Permitted Encumbrance |

| Name | Mill Creek Mining Inc. | |
|---|---|---|
| Registered number | Virginia ID #0762467-9 | |
| Previous names | None | |
| Date of incorporation | 18 March 2013 | |
| Place of incorporation | Richmond, Virginia, USA | |
| Registered office address | 200, 407 – 3rd Street SW, Calgary, AB T2P 4Z2 | |
| Issued Share capital | 100 common shares, registered as follows: | |
| | **Shareholder** | **No. of shares** |
| | Cobalt Coal Corp Holdings, Inc. | 100 |
| Directors | Kenneth L. DeWyn | |
| | Al J. Kroontje | |
| Last annual return made up to | 3 March 2015 | |
| Bank | None | |
| Charges | Permitted Encumbrance | |

## SCHEDULE 2

### Closing

1.    **ITEMS FOR DELIVERY BY THE SELLER**

The Seller shall deliver to the Buyer:

1.1    certified copy of the board resolution of the Seller authorising the sale of the Shares on the terms of this agreement and the execution and delivery of this agreement and any agreement or documents required to be executed and delivered by the Buyer pursuant to the terms of this agreement;

1.2    duly executed transfers of the Shares in favour of the Buyer (or such other person as the Buyer directs);

1.3    the certificates for the Shares;

1.4    such waivers or consents as the Buyer may require to enable full beneficial ownership of the Shares to vest in the Buyer or its nominee and for the Buyer or its nominee to be registered as the holder of the Shares;

1.5    a certified copy of any power of attorney under which this agreement or any document to be delivered to the Buyer pursuant to this **schedule 2** has been executed;

1.6    the common seal (if any), certificate of incorporation, certificate(s) of incorporation on change of name (if any) and statutory books of the Company (including each register, minute book and other books required to be kept by all relevant law and Government Authority) made up to the date of Closing;

1.7    the certificates for the shares in the capital of each Subsidiary;

1.8    the written resignations of the directors of the Company and the Subsidiaries, in the form agreed by the Buyer;

1.9    copies of the Loan Agreement (as defined in **clause 8.1.1**), the Assignment (as defined in **clause 8.1.2**) and Security Documents (as defined in **clause 8.1.1**) and the Discharges (as defined in **clause 8.2.4**) in the form agreed by the Buyer and any other documents and things as the Buyer may properly and reasonably request: (i) to implement **clause 8.2** relating to the Cobalt Senior Debt (as defined in **clause 8.1.1**); and (ii) conclude its due diligence in relation to the Permitted Encumbrance to the Buyer's satisfaction;

1.10    in relation to each bank account maintained by the Company:

1.10.1    a statement for that account as at the close of business on the Business Day immediately prior to Closing, and a statement reconciling those balances with the cash book of the Company as at Closing;

1.10.2    a copy of the mandate for that account; and

1.10.3    all cheque books in respect of that account;

1.11    all credit, debit or other cards in the name of or for the account of the Company;

1.12    the deeds, certificates and other documents of title to the assets of the Company (including the original leases for the Leased Real Property);

1.13    evidence in a form satisfactory to the Buyer that debts and accounts between the Company and each Seller, any Seller's Group Company or any other person connected with any of them have been fully paid; and

1.14    such other documents and things as the Buyer may properly and reasonably request to implement the transaction contemplated by this agreement.

2.    **BOARD MEETING**

The Seller shall procure that a board meeting of the Company and each Subsidiary is held at which:

2.1    in the case of the Company, the share transfers referred to in **paragraph 1.2 above** are approved;

15750547.3

2.2     such persons as the Buyer may nominate as directors are appointed;

2.3     its registered office is changed to 7342 Alabama Highway 117, Flat Rock, Alabama 35966 USA; and

2.4     existing authorities and instructions to bankers in respect of the operation of the Company's and each Subsidiary's bank accounts are revoked and new authorities and instructions are issued in such terms as the Buyer may require.

3.      **ITEMS FOR DELIVERY BY THE BUYER**

3.1     The Buyer shall deliver to the Seller a certified copy of board minutes of the Buyer authorising the acquisition of the Shares on the terms of this agreement and the execution and delivery of this agreement and any agreements or documents required to be executed and delivered by the Buyer pursuant to the terms of this agreement; and

3.2     the payment of the Initial Consideration in accordance with **clause 4.2**.

15750547.3

**SCHEDULE 3**

**Consideration**

**Definitions**

**Coal**

includes the natural dark brown to black graphite like material used for fuel or metallurgical processes formed from fossilized plants and consisting of amorphous carbon with various organic and some inorganic compounds and includes, without limitation, thermal coal and metallurgical coal. For the purposes of this **schedule 3**: (i) **Raw Coal** means coal derived from operations at the Leased Real Property that is otherwise known as run-of-mine coal, being mined coal to which no processing, screening, sorting or washing process has occurred; (ii) **Clean Coal** means coal derived from operations at the Leased Real Property that is not Raw Coal; and (iii) **Coal** means, collectively, Raw Coal and Clean Coal; and

**Year**

each of Year One, Year Two, Year Three, Year Four, Year Five and Year Six, as defined below:

|  | means the 12 calendar month period ending on the following anniversary of the Closing Date: |
| --- | --- |
| **Year One** | First |
| **Year Two** | Second |
| **Year Three** | Third |
| **Year Four** | Fourth |
| **Year Five** | Fifth |
| **Year Six** | Sixth |

Subject to Closing and **clause 8.2**:

1.    The total aggregate Consideration shall not exceed US$25,850,000.

2.    At Closing, the Buyer shall pay to the Seller the Initial Consideration, being US$50,000, in accordance with **clauses 3 and 4**.

3.    On or before the last date of each calendar month period following the Closing Date and up to the last date of the eighth calendar month following Closing, the Buyer shall pay to the Seller US$100,000 being, for the avoidance of doubt, a total aggregate amount of US$800,000.

4.    Subject to **paragraph 5** of this **schedule 3**, the balance of the Consideration shall be paid within 30 Business Days of the end of each Year, starting from Year 2, when the Buyer shall pay to the Seller the greater of:

   4.1.1    US$2.5 million provided that Clean Coal produced and sold from the Leased Real Property for that Year does not exceed 600,000 tonnes; and

   4.1.2    US$5 million provided that Clean Coal produced and sold from the Leased Real Property for that Year exceeds 600,000 tonnes,

   provided always that the total aggregate Consideration shall not exceed US$25,850,000.

5.   If at the end of Year Six, the total aggregate Consideration paid by the Buyer to the Sellers is less than US$25,850,000, the balance of the Consideration up to US$25,850,000 shall be paid within 30 Business Days of the end of each 12 calendar month period ending on each subsequent anniversary of the Closing Date when the Buyer shall pay to the Seller US$5 million provided that Clean Coal is produced and sold from the Leased Real Property in that Year and if Clean Coal is not produced and sold from the Leased Real Property in that Year, the payment for that Year shall be reduced from US$5 million to US$2.5 million.  For the avoidance, of doubt, the final payment by the Buyer in accordance with this **paragraph 5** shall be the lesser of: (i) US$5 million or US$2.5 million (as applicable); and (ii) the outstanding balance of the Consideration up to US$25,850,000.

## SCHEDULE 4

### Warranties

A reference to the "Company" in this agreement shall be deemed to include a reference to each Group Company and the Warranties shall be given in respect of and in relation to each Group Company.

1. **CAPACITY**

1.1   The Seller has full power and authority, and has taken all action necessary (including obtaining all necessary consents or approvals) to enter into and perform this agreement and any other deeds, agreements or documents to be entered into pursuant to this agreement.

1.2   This agreement (and the agreements or documents to be entered into pursuant to this agreement) will, when executed, constitute obligations binding on the Seller in accordance with their terms.

2. **THE SHARES**

2.1   The Shares are fully paid or credited as fully paid, constitute 90% of the share capital of the Company and have been properly allotted and issued.  The Shares are voting shares.

2.2   The Seller is the only legal and beneficial owner of the Shares. There is no Encumbrance on, over or affecting any of the Shares or any unissued shares, debentures or other securities of the Company (other than the Permitted Encumbrance) nor is there any agreement, arrangement or obligation to create or give an Encumbrance in relation to any of the Shares or any unissued shares, debentures or securities of the Company.

2.3   No person has the right (whether exercisable now or in the future and whether contingent or not) to call for the issue, allotment, conversion, redemption, repayment, sale or transfer of any shares, debentures or other securities of the Company (other than the Permitted Encumbrance).

2.4   The Seller is entitled to sell the Shares with full title guarantee on the terms of this agreement without the consent of any third party (and where such consent is required it has been obtained) and such sale will not result in any breach of or default under any agreement or obligation binding upon the Seller.

2.5   There is no litigation, arbitration, prosecution, administrative or other legal proceedings or dispute in existence or threatened against any of the Seller or the Company in respect of the Shares or any unissued shares, debentures or securities of the Company or the Seller's entitlement to dispose of the Shares and there is no fact or circumstance which might give rise to any such proceedings or dispute.

2.6   There are no rights of pre-emption over or restrictions relating to the transfer of the Shares which could apply on the sale of the Shares to the Buyer.

2.7   The remaining 10% of the share capital of the Company are legally and beneficially owned by the Seller (the **10% Shares**).

2.8   The 10% Shares are fully paid or credited as fully paid, constitute 10% of the share capital of the Company and have been properly allotted and issued.  The 10% Shares are voting shares.

2.9   The Seller is the only legal and beneficial owner of the 10% Shares. There is no Encumbrance on, over or affecting any of the 10% Shares (other than the Permitted Encumbrance) nor is there any agreement, arrangement or obligation to create or give an Encumbrance in relation to any of the 10% Shares.

2.10   There is no litigation, arbitration, prosecution, administrative or other legal proceedings or dispute in existence or threatened against any of the Seller or the Company in respect of the 10% Shares or the Seller's entitlement to dispose of the 10% Shares and there is no fact or circumstance which might give rise to any such proceedings or dispute.

2.11   The Discharges when released in accordance with **clauses 8.2.4 and 8.2.5** will result in Tailwind having no recourse to any of the Seller, the Buyer, the Company, the Subsidiaries

or any Buyer's Group Company (from time to time) in relation to the Loan Agreement, the Assignment, the Security Documents, the Cobalt Senior Debt (including the principal amount together with interest thereon) and the Permitted Encumbrance, and shall constitute a valid, full and proper discharge and release of the Security Documents, the Permitted Encumbrance and any obligation to repay the Cobalt Senior Debt (including the principal amount together with interest thereon).

3.     **THE COMPANY AND THE GROUP**

3.1    The Company is a limited company incorporated under West Virginia, USA law and has been in continuous existence since incorporation. The Company has the right, power, capacity and authority to conduct its business as conducted at the date of this agreement.

3.2    The Company has not been a subsidiary of any body corporate (wherever incorporated) at any time since its incorporation other than the Seller.

3.3    **Subsidiaries**

3.3.1   The Company has not at any time been, and will not at Closing be, the owner or registered holder of any share, loan capital, interest or equity in, or other security of, any body corporate (wherever incorporated) other than the Subsidiaries nor has it agreed to become the owner or registered holder of any such share, loan capital, interest, equity or other security.

3.3.2   The Company has never had a participating interest in any other company or undertaking other than the Subsidiaries, C&B Coal LLC (dissolved), Westchester Coal GP (sold) and Westchester Coal LP (sold).

3.3.3   The Company is the owner of each allotted and issued share in the capital of each Subsidiary and each such share is fully paid or credited as fully paid.

3.3.4   There is no Encumbrance on, over or affecting any of the shares in a Subsidiary or any unissued shares, debentures or other securities of a Subsidiary (other than the Permitted Encumbrance) nor is there any agreement, arrangement or obligation to create or give an Encumbrance in relation to any such shares, debentures or securities.

3.3.5   No person has the right (whether exercisable now or in the future and whether contingent or not) to call for the issue, allotment, conversion, redemption, repayment, sale or transfer of any shares, debentures or other securities of a Subsidiary or the 10% Shares (other than the Permitted Encumbrance).

3.3.6   There is no litigation, arbitration, prosecution, administrative or other legal proceedings or dispute in existence or threatened against the Company in respect of any shares, debentures or securities of a Subsidiary and, so far as the Seller is aware, of C&B Coal LLC, Westchester Coal GP or Westchester Coal LP and there is no fact or circumstance which might give rise to any such proceedings or dispute.

3.4    **Directors**

3.4.1   The only directors of the Company are the persons listed in **part 1** of **schedule 1** and the only directors of the Subsidiaries are the persons listed in respect of each such Subsidiary in **part 2** of **schedule 1**.

3.4.2   No person is a shadow director of the Company

4.     **COMPANY ADMINISTRATION**

4.1    A true, complete and accurate copy of the memorandum and articles of association of the Company at the date of this agreement is included in the Disclosure Documents, which memorandum and articles of association contain all documents required to accompany them by all relevant law and Government Authority.

4.2    The Company has at all times carried on its business and affairs in accordance with its constitution (at the relevant time).

4.3   Each register, minute book and other book which the Company is required by law to keep has been properly kept and contains a true, complete and accurate record of the matters which it is required to record. No notice has been received or allegation made that a register or book is incorrect or should be rectified.

4.4   All returns, particulars, resolutions and other documents required by all relevant law and Government Authority to be delivered on behalf of the Company to any authority, organisation, person or body have been properly made, delivered and filed within the relevant time period.

4.5   The Company has not given any power of attorney or other authority by which a person may enter into an agreement, arrangement or obligation on the Company's behalf (other than an authority for a director, other officer or employee to enter into an agreement in the normal and ordinary course of his duties).

5.   **INFORMATION**

5.1   The information set out in **schedules 1, 5, 6, 7 and 8** to this agreement is true, complete, accurate and not misleading in all respects.

5.2   All information which has been given by or on behalf of the Seller to the Buyer and/or its professional advisers or agents in the course of the negotiations leading to this agreement is true, complete, accurate and not misleading in all respects and does not omit anything which makes such information untrue, inaccurate or misleading.

5.3   The information contained in the Disclosure Documents is true, complete, accurate and not misleading and does not omit anything which makes such information untrue, in accurate or misleading.

5.4   All information relating to the Shares, the Company, its business and assets which is material to be known by a buyer for value of shares in the Company for the Consideration and on the terms of this agreement has been Disclosed.

6.   **ACCOUNTS**

6.1   The Accounts (a true, complete and accurate copy of which is included in the Disclosure Documents):

6.1.1   comply with all relevant law;

6.1.2   have been prepared in accordance with generally accepted accounting principles and practices in Canada at the date on which the Accounts were approved by the directors;

6.1.3   show a true and fair view of the financial position and state of affairs of the Company as at the Accounts Date and of its profit (or loss) and cash flow for the financial period ended on that date;

6.1.4   fully disclose all assets owned and/or used by the Company, make full reserve against all assets and fully provide for all bad and doubtful debts, accruals, liabilities and capital commitments of the Company (in each case whether actual, contingent, unquantified or disputed) and whether or not known or discernable by the Company or the Seller; and

6.1.5   have been prepared on a basis wholly consistent with that used for the preparation of the Company's accounts for the last three financial periods.

6.2   All accounts, books, ledgers, financial and other records of any kind of the Company (including all invoices and other records required for tax purposes) have at all times been fully, properly and accurately maintained in accordance with the law and applicable standards, principles and practices generally accepted in the United Kingdom, Canada and the United States of America, are properly written up to date and are in the Company's possession or under its control.

6.3   There are no contingent liabilities not clearly detailed and reflected in the Accounts.

6.4     The creditor balance as at 31 December 2014 (a true, complete and accurate copy of which is included in the Disclosure Documents) represents a complete and accurate summary of creditors.

7.      **BUSINESS SINCE THE ACCOUNTS DATE**

        Since the Accounts Date:

7.1     the Company's business has been carried on in the normal and ordinary course so as to maintain it as a going concern;

7.2     there has been no material adverse change in the turnover, the financial or trading position or prospects of the Company and there is no fact or circumstance which might give rise to any such adverse change;

7.3     there has been no material change in the assets or liabilities of the Company as shown in the Accounts (other than changes arising from routine payments and the routine supply of goods or services in the normal and ordinary course of trading);

7.4     the Company has not, other than in the normal and ordinary course of its business:

        7.4.1     acquired or disposed of, or agreed to acquire or dispose of, any business or asset; or

        7.4.2     assumed or incurred, or agreed to assume or incur, a liability, obligation, expense or capital expenditure (whether, in any case, actual or contingent);

7.5     the Company has not been adversely affected by the termination, or a change in the terms, of an important agreement or by the loss of or material reduction in orders from a customer or the loss of or material reduction in any source of supply or by any abnormal factor not affecting similar businesses to a similar extent and there is no fact or circumstance which might give rise to any such adverse effects;

7.6     the Company has not paid or declared any dividend or other distribution, whether of capital or income;

7.7     the Company has not created, allotted, issued or acquired any share or loan capital, or made an agreement or arrangement or undertaken an obligation to do any of those things;

7.8     no resolution of the members of the Company (or any class thereof) has been passed; and

7.9     neither the Company nor the Seller has done or omitted to do anything which will or might prejudicially affect the goodwill of the Company.

8.      **ASSETS**

8.1     The Company owns each asset necessary or desirable for the effective operation of its business as carried on at the date of this agreement and the Company does not make use of any asset which is not included in the Accounts.

9.      **STOCK**

9.1     The Company's stock (which term shall, in this **paragraph 9**, include raw materials, components, parts, work in progress, finished and partly finished goods and packaging material consumables) is:

        9.1.1     not excessive and is adequate for the normal requirements of its business having regard to current orders and reasonably anticipated orders;

        9.1.2     of satisfactory quality, in good condition and capable of being sold by the Company in the normal and ordinary course of its business in accordance with current prices, without rebate or allowance;

        9.1.3     not damaged, slow moving, obsolete, unusable, or of limited value; and

        9.1.4     included in the books of accounts of the Company at the lower of cost or net realisable value.

9.2     None of the stock referred to in the Accounts has realised an amount less than the value that was placed on it in the Accounts.

15750547.3

27

9.3    None of the Company's stock contains any defect (whether of design, manufacture, assembly or otherwise) which could give rise to a liability on the part of the Company to any third party if that stock or product incorporating it were subsequently sold by the Company.

10.    **DEBTS**

10.1   No debt shown in the Accounts or the Company's accounting records is overdue by more than 12 weeks or is the subject of an arrangement not made in the normal and ordinary course of business and, other than debts owed to the Seller, none of those debts has been released, deferred, subordinated or written off or has become irrecoverable in whole or in part.

10.2   The Company is not entitled to the benefit of any debt shown in the Accounts or the Company's accounting records otherwise than as the original creditor and is not, and has not agreed to become, a party to any factoring or discounting arrangement in respect of such debts.

11.    **CONFIDENTIAL INFORMATION AND TECHNICAL INFORMATION**

       The Company has not disclosed any Confidential Information or Technical Information to any person except where such disclosure was properly made in the normal and ordinary course of the Company's business.

12.    **CONTRACTS**

12.1   The Disclosure Documents contain true, complete and accurate copies of:

       12.1.1    all material contracts to which the Company is a party, whether or not in the normal and ordinary course of business;

       12.1.2    details of all orders received by the Company which are in any respect outstanding; and

       12.1.3    all tenders, quotations or offers made by the Company which are or may become capable of giving rise to a contract by the issue of an order or acceptance by any other party.

12.2   The Company is not a party to or subject to any contract, agreement, transaction or arrangement or subject to any liability, which:

       12.2.1    is of an unusual or onerous nature, was entered into outside the normal and ordinary course of business, is not of an entirely arms' length nature or is likely to be loss making;

       12.2.2    is incapable of termination in accordance with its terms on not more than 90 days' notice served by the Company at any time;

       12.2.3    is incapable of being fully performed in accordance with its terms within six months of the date on which it was entered into;

       12.2.4    cannot be readily performed by the Company without undue expenditure or application of money, effort or personnel;

       12.2.5    constitutes a sale or purchase, option or similar agreement, arrangement or obligation affecting the Company's business or any of its assets;

       12.2.6    is a distributorship, agency, franchise or management agreement or arrangement;

       12.2.7    is a lease or hire, hire purchase, credit sale or conditional sale agreement;

       12.2.8    is on terms materially different to the Company's standard terms of business (a true, complete and accurate copy of which is included in the Disclosure Documents);

       12.2.9    has or is likely to have a material effect on the financial or trading position or prospects of the Company; and

       12.2.10   involves, or is likely to involve obligations or liabilities which ought reasonably to be made known to an intending buyer of the Shares.

15750547.3

12.3 Neither the Company nor the Seller have any knowledge of the invalidity of, or a ground for termination, avoidance or repudiation of, a contract, agreement or arrangement to which the Company is a party. No party with whom the Company has entered into a contract, agreement or arrangement has given notice of its intention to terminate, or has sought to repudiate or disclaim, the contract, agreement or arrangement. The Company has not received written notice of any actual or proposed changes to the prices or other material terms of any contracts, agreements or arrangements to which it is a party.

12.4 The contracts, agreements and arrangements entered into by the Company have been duly complied with, no party to such a contract, agreement or arrangement is in breach of any such contract, agreement or arrangement and there is no fact or circumstance which might give rise to a such breach. No contract, agreement or arrangement to which the Company is a party is the subject of any dispute or claim and there is no fact or circumstance which might give rise to any such dispute or claim.

13. **JOINT VENTURES AND PARTNERSHIPS**

The Company is not, nor has it agreed to become, a member of any joint venture, consortium, partnership or other unincorporated association or a party to any agreement or arrangement for sharing profit, commissions or other income.

14. **TRADING**

14.1 The Company does not have, and has not conducted any part of its business through, any branch, place of business or agency outside the United States of America or Canada. The Company does not have any substantial assets outside the United States of America or Canada.

14.2 During the year ending on the date of this agreement no substantial customer or supplier of the Company has:

14.2.1 stopped, or indicated an intention to stop, trading with or supplying the Company;

14.2.2 reduced, or indicated an intention to reduce, to a material extent its trading with or supplies to the Company; or

14.2.3 changed, or indicated an intention to change, to a material extent the terms on which it is prepared to trade with or supply the Company (other than normal price and quota changes).

14.3 No customer (including any person connected with such customer) accounts for more than 5% of the aggregate value of all sales made by the Company in the 12 months ending on the date of this agreement.

14.4 No supplier (including any person connected with such supplier) accounts for more than 5% of the aggregate value of all purchases made by the Company in the 12 months ending on the date of this agreement.

14.5 The Company has paid its creditors within the times agreed with them. No amount owing by the Company to a creditor has been due for more than four weeks.

14.6 The Company has not manufactured, sold or supplied goods or services which are or were or will become in any material respect faulty or defective or which do not comply in any material respect with any warranties or representations expressly or impliedly (whether by statute, common law or otherwise) made by it or with any applicable regulations, standards and requirements.

14.7 All documents, files, data and reports related to the development, future planning and operation of the Leased Real Property (as defined below) are in the possession of the Company or its Subsidiaries.

14.8 The Company, in of itself or through its Subsidiaries, holds all of the leases, permits and other assets necessary to prepare and operate the mines at the Leased Real Property.

15.   **LITIGATION AND COMPLIANCE WITH LAW**

15.1   Except in relation to the collection of unpaid debts arising in the normal and ordinary course of business, neither the Company nor a person for whose acts or defaults the Company may be vicariously liable is involved, or has during the two years ending on the date of this agreement been involved, in a civil, criminal, arbitration, administrative or other proceeding in any jurisdiction. No civil, criminal, arbitration, administrative or other proceeding in any jurisdiction is pending or threatened by or against the Company or a person for whose acts or defaults the Company may be vicariously liable and there is no fact or circumstance which might give rise to any such proceeding.

15.2   There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Governmental Authority or agency in any jurisdiction against the Company or a person for whose acts or defaults the Company may be vicariously liable.

15.3   The Company has at all times carried on its business and used and dealt with its assets in compliance with all applicable legal and administrative requirements, laws and regulations whether of the United States of America or elsewhere.

15.4   The Company is not currently, nor has it ever been, the subject of any governmental or other investigation, enquiry or disciplinary proceeding in any jurisdiction, no such investigation, enquiry or proceeding is pending or threatened and there is no fact or circumstance which might give rise to any such investigation, enquiry or proceeding.

16.   **PERMITS, MINING AUTHORISATIONS AND BONDS**

16.1   Schedule 7 lists the existing Permits of the Company.

16.2   The Company has obtained and complied with all Permits, licences, permissions, authorisations and consents required to own and operate its assets and carry on its business. All such Permits, licences, permissions, authorisations and consents are in full force and effect and are unconditional and there is no indication that any such licence, permission, authorisation or consent might be revoked, suspended, cancelled, varied or not renewed.

16.3   The Permits are all that is necessary to own, lease, develop or operate its assets and conduct its business as presently being conducted. The Permits are in full force and effect and will not be invalidated, suspended, cancelled or otherwise impaired by reason of the Closing and/or the matters covered by this agreement. The Company is not in violation or in default of any Permit, and neither the Seller nor the Company have received any written notification from any Governmental Authority threatening to suspend, revoke, withdraw, modify or limit the Permits and to the knowledge of the Seller, there are no circumstances or conditions providing grounds for any suspension, revocation, withdrawal, modification or limitation on the Permits (other than ongoing site work and expansion of existing permits work in accordance with the normal course of business).

16.4   There are no material mining, licenses, permits or other mining authorisations owned by the Company relating to deep mining, surface mining, highwall mining and auger mining, the processing, sale or transporting of coal and coal byproducts, or activities defined under the Surface Mining Control and Reclamation Act 1977, as amended, as "surface coal mining operations," other than those set out in the Disclosure Documents (the **Mining Authorisations**) (true, complete and accurate copies of which are included in the Disclosure Documents). The Company holds the legal and beneficial title to the interest in each of the Mining Authorisations and all such Mining Authorisations are in full force and effect, free and clear of any and all Encumbrances (other than the Permitted Encumbrance). To the knowledge of the Seller, such Mining Authorisations are all of the Mining Authorizations necessary for the operation by the Company of its business as presently conducted. There are no applications for other Mining Authorisations, or amendments to the existing Mining Authorisations. The Company is in compliance, in all material respects with the terms and conditions of the Mining Authorisations. There are no material matters that adversely affect the title of the Company to any Mining Authorisation, nor, any material matters relating to the Company, which adversely affect the use of the Mining Authorisations for the purposes of the business of the Company. The Company is not in violation or in default of the Mining Authorisations, and neither the Seller or the Company have received

any written notification from any Governmental Authority threatening to suspend, revoke, withdraw, modify or limit any of the Mining Authorisations and to the knowledge of the Seller, there are no circumstances or conditions providing grounds for any suspension, revocation, withdrawal, modification or limitation of any of the Mining Authorisations.

16.5    The Company has posted the deposits, letters of credit, trust funds, bid bonds, performance bonds, reclamation bonds and surety bonds (and all such similar undertakings) (the **Surety Bonds**) as set out in the Disclosure Documents (true, complete and accurate copies of which are included in the Disclosure Documents). The Company is in compliance in all material respects with the Surety Bonds and they remain to the benefit of the Company. The state of reclamation with respect to the Company's Mining Authorisations is "current" with respect to the reclamation obligations required by the Mining Authorisations and is in compliance in all material respects with the Mining Authorisations and all applicable mining, reclamation and other analogous laws.   The Company has not received notice of any additional bonding requirements from any Governmental Authority.

17.    **HEALTH & SAFETY**

17.1    The Company has complied with all of its obligations and duties under all Health & Safety Laws, and the activities of the Company are and have always been carried on in accordance with all relevant Health & Safety Laws.

17.2    The Company has not received any communication from any regulatory authority with regard to any alleged breach of Health & Safety Laws and there have been no complaints, investigations, enquiries, requests for information or other formal or informal indications of any possible claims or legal actions in respect of Health & Safety Matters from any person, including any neighbour, current or former employee, or regulatory authority.

18.    **ENVIRONMENTAL MATTERS**

18.1    The activities of the Company are, and have at all times, been carried on in compliance with all relevant Environmental Laws.

18.2    The Company has obtained all Environmental Licences (full details of which are set out in the Disclosure Documents), all such Environmental Licences are in full force and effect and there has been no default in the observance of any Environmental Licence by the Company, its officers, employees, consultants or agents.

18.3    The Company has not received any claim, notice, requirement or complaint from any person, regulatory body, court or competent organisation in respect of Environmental Matters which:

18.3.1    might prevent the continued use of any part of the Leased Real Property in the manner and for the purpose for which it is now being used;

18.3.2    requires any remedial work to the Leased Real Property or the clearance or removal from the Leased Real Property of any Relevant Substance; or

18.3.3    alleges any breach of Environmental Laws,

and there is no fact or circumstance which might give rise to any such claim, notice, requirement or complaint.

18.4    No process or activity has been carried on at the Leased Real Property which has caused, will cause or may cause pollution of the environment or harm to human health (in each case within the meaning of the United Kingdom Environmental Protection Act 1990) or will result in a legally enforceable obligation on the Company in respect of such pollution or harm to human health.

18.5    Other than pursuant to terms contained in any of the leases pertaining to the Leased Real Property (as defined below), the Company has not entered into any material agreement requiring the Company to indemnify, reimburse, defend or hold harmless any other person from and against any liabilities under Environmental Law.

19.    **COMPETITION**

The Company is not, nor has it ever been, a party to any agreement, arrangement or practice, nor is it engaged in any course of conduct or practice which:

15760647.3

| | |
|---|---|
| 19.1 | Infringes or has infringed any competition, anti-trust or restrictive trade practices law, rule or regulation anywhere in the world; or |
| 19.2 | is or has been the subject of any fine or penalty, imposed or threatened to be imposed, for any reason including infringement of any law, regulation or administrative provision or similar matter relating to fair competition, anti-trust, monopolies, mergers or similar by any authority, court or tribunal of competent jurisdiction of any country. |

## 20. INSURANCE

| | |
|---|---|
| 20.1 | The Company has at all times been and is at the date of this agreement adequately insured against accident, damage, injury, third party loss (including product liability), loss of profits and all other risks normally insured against by a person operating the types of business operated by the Company. |
| 20.2 | Full, complete and accurate particulars of all insurance and indemnity policies maintained by the Company or in which the Company has an interest (together, the **Policies**), including all endorsements on such Policies, are set out in the Disclosure Documents. Each of the Policies is valid and enforceable and is not void or voidable. Neither the Company, nor any director, employee or agent of the Company, has done anything or omitted to do anything which might make any of the Policies void or voidable or which might result in an increase in the premium payable under any of the Policies. |
| 20.3 | There is no claim outstanding under any of the Policies and there is no fact or circumstance which might give rise to such a claim. |

## 21. EMPLOYEES

| | |
|---|---|
| 21.1 | In this **paragraph 21**, **Employees** shall mean all the employees, workers, officers, consultants and/or agents of the Company. |
| 21.2 | The Company has not and has never had any Employees. |
| 21.3 | The Company does not maintain any employee benefit plan, arrangement, policy, practice, contract or agreement (including without limitation, employment agreements, change of control agreements and severance agreements, deferred compensation, incentive compensation, bonus, stock option, equity-based and stock purchase plans) of any type within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended. The Company does not have any formal plan or commitment, whether legally binding or not, to create any employee benefit plans. |

## 22. PENSIONS

| | |
|---|---|
| 22.1 | The Company does not have any obligation (whether or not legally binding) to provide or contribute towards any pension, lump-sum, death, ill-health, disability or accident benefits in respect of its past or present officers and employees. |

## 23. FINANCIAL FACILITIES

| | |
|---|---|
| 23.1 | A statement of the credit or debit balances on each investment, deposit or bank account maintained by the Company as at a date not more than two Business Days prior to the date of this agreement, together with full details of those accounts, is included in the Disclosure Documents, together with statements showing and reconciling those statements with the cash book balances of the Company at the date of this agreement. Since such statements there have been no payments out of any such accounts except for routine payments in the normal and ordinary course of business and the balances on current account are not now substantially different from the balances shown on such statements. |
| 23.2 | Full details of all overdrafts, loans or other financial facilities outstanding or available to the Company are set out in and true, complete and accurate copies of all documents relating to such matters are included in the Disclosure Documents. |
| 23.3 | Having regard to its existing banking and other facilities, the Company has sufficient working capital for the purpose of continuing to carry on its business in its present form and at its present level of turnover for the next 12 months and for the purposes of executing, carrying out and fulfilling in accordance with their respective terms all orders, projects and contractual obligations that have been placed with or undertaken by the Company. |

15750547.3

23.4    The Company is not a party to and is not liable (including contingently) under a guarantee, indemnity or other agreement to secure or incur a financial or other obligation with respect to another person's obligation.

23.5    No part of the loan capital, borrowing or indebtedness in the nature of borrowing of the Company is dependent on the guarantee or indemnity of, or security provided by, another person.

23.6    The Company does not have outstanding any Encumbrance or any obligation (including a conditional obligation) to create any Encumbrance.

23.7    No event has occurred or been alleged which:

23.7.1    constitutes an event of default, or otherwise gives rise to an obligation to repay, under an agreement relating to borrowing or indebtedness in the nature of borrowing (or will do so with the giving of notice or lapse of time or both); or

23.7.2    will lead to an Encumbrance constituted or created in connection with borrowing or indebtedness in the nature of borrowing, a guarantee, an indemnity or other obligation of the Company becoming enforceable (or will do so with the giving of notice or lapse of time or both),

and there is no fact or circumstance which might give rise to any such obligation to repay or to any such Encumbrance becoming enforceable.

24.    **INSOLVENCY**

24.1    No order or application has been made or resolution passed for the winding up of the Company or the Seller or for the appointment of a provisional liquidator to the Company or the Seller; no petition has been presented and no application has been made to court for an administration order in respect of the Company or the Seller and no notice of an intention to appoint an administrator of the Company or the Seller has been given or filed; no receiver or receiver and manager has been appointed of the whole or part of the business or assets of the Company or the Seller; no voluntary arrangement has been proposed under section 1 United Kingdom Insolvency Act 1986 in respect of the Company or the Seller; and no compromise or arrangement has been proposed, agreed to or sanctioned under part 26 of the United Kingdom Companies Act 2006 in respect of the Company or the Seller.

24.2    Neither the Company nor the Seller is insolvent or unable to pay its debts within the meaning of section 123 United Kingdom Insolvency Act 1986. Neither the Company nor the Seller has stopped paying its debts as they fall due.

24.3    No action is being taken by any authority, organisation, person or body to strike the Company or the Seller off the register of companies (or its equivalent).

25.    **EFFECT OF SALE**

Neither the execution and delivery nor the performance of this agreement or of a document or agreement entered into pursuant to this agreement or of any obligation under it will:

25.1    conflict with or constitute or result in a breach of or default under or require the consent of a person under an agreement, arrangement or obligation to which the Company or the Seller is a party or a legal or administrative requirement in relation to the Company or the Seller in any jurisdiction;

25.2    result in the Company losing the benefit of an asset, licence, grant, subsidy, right or privilege which it enjoys at the date of this agreement in any jurisdiction;

25.3    relieve any person from any obligation under any contract, agreement or arrangement to which the Company is a party or entitle any person to terminate any such obligation or any right or benefit enjoyed by the Company under any such contract, agreement or arrangement; or

25.4    result in the creation, imposition, crystallisation or the enforcement of any Encumbrance on or over any of the Company's assets.

26.     INSIDER AGREEMENTS

26.1    The Seller nor any person connected with the Seller is, or has at any time in the five years prior to the date of this agreement, been involved, engaged or interested in any other company or business which in any way overlaps or competes with, or is likely to compete with, or has in any way affected the trading results and performance of the Company.

26.2    There is, and during the three years ending on the date of this agreement there has been, no agreement or arrangement (legally enforceable or not) affecting the Company to which the Seller is or was a party and in which the Seller, a director or former director of the Company or a person connected with any of them is or was interested in any way, other than a bona fide contract of employment made between the Company and the Seller or a director or former director of the Company in the normal and ordinary course of business.

27.     LEASED REAL PROPERTY

27.1    The Company does not have any Owned Real Property. **Schedule 6** sets out all real property and other material interests in land (surface, mineral or fee simple), including the coal, mining and surface rights, easements, rights of way and options, leased or subleased by the Company (whether by virtue of a direct lease or sublease) as lessee (the **Leased Real Property**). With respect to the coal reserves located upon the Leased Real Property, notwithstanding anything in this agreement to the contrary, the Buyer accepts the coal reserves in or under the Leased Real Property, as is, where is, together with the mining data of the Company, free of any warranty, express or implied, with regard to the mineability, washability, recoverability, volume, quantity or quality of any coal reserve. The coal reserves mined by the Company and owned or leased by the Company are not subject to the mining rights of any other person with respect to such coal reserves, except for surface use and other appurtenant rights for the mining of the coal seams that are not owned or leased by the Company. The Company is the sole person owned by the Seller for the purpose of exploiting the Leased Real Property.

27.2    The leases and subleases for the Leased Real Property are in full force and effect and are unconditional and there is no indication that any such lease or sublease might be revoked, suspended, cancelled, varied or not renewed.

28.     TAXES

28.1    All Taxes due and payable by the Company have been timely paid to the appropriate Governmental Authority.

28.2    There are no Encumbrances for Taxes upon any property or assets of the Company, except for Encumbrances arising by operation of law for Taxes not yet due and payable.

28.3    The Company has complied with all laws relating to the payment and withholding of Taxes and has, within the time and in the manner prescribed by law, withheld and paid over to the proper Governmental Authority all amounts required to be so withheld and paid over under law. The Company has not requested an extension of time within which to file any Tax Return that has not since been filed.

28.4    No agreement or other document waiving or extending the statute of limitations or the period of assessment for collection of any Taxes payable by the Company has been filed or entered into with any Governmental Authority.

## SCHEDULE 5

### Tax Indemnity

**Definitions**

**Taxes**

taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever imposed by any Governmental Authority, including all interest, penalties, fines, additions to tax or other additional amounts imposed in respect of it (including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, valued-added, excise, stamp, withholding, premium, business, franchising, property, employer health, payroll, employment, health, social services, education and social security taxes, surtaxes, customs duties and import and export taxes, licence, franchise and registration fees and employment insurance, health insurance and other government pension plan premiums or contributions), and "Tax" has a corresponding meaning; and

**Tax Return**

all returns, declarations, designations, forms, schedules, reports and other documents of every nature whatsoever required to be filed with any Governmental Authority with respect to any Taxes.

1.  **Preparation and Filing of Tax Returns.**  The Seller shall procure all income and capital Tax Returns of the Company and each Subsidiary that relate to on or before the Closing Date and are not due for filing until after the Closing Date to be prepared and promptly filed as soon as possible.

2.  **Seller's Indemnification.**  From and after the Closing Date, the Seller shall indemnify the Buyer against all liabilities, costs, expenses, damages and losses and all other reasonable professional costs and expenses) suffered or incurred by the Buyer or the Company or any Subsidiary arising out of or in connection with any inaccuracy in, or breach of, a representation and warranty made in **schedule 4, paragraph 28** and for all Taxes payable by the Company or any Subsidiary for, or arising from, all periods on or before the Closing Date.

3.  **Seller's Contest Rights.**  The Seller shall use its best endeavours to promptly control, defend, settle, compromise, or prosecute in any manner an audit, examination, investigation, and other proceeding with respect to any Tax Return of the Company or any Subsidiary filed that relate to on or before the Closing Date.  The Seller shall keep the Buyer duly informed of any proceedings in connection with any matter for which the Buyer may have a right to indemnification pursuant to this **schedule 5** and shall promptly provide the Buyer with copies of all correspondence and documents relating to those proceedings.

## SCHEDULE 6

### Leased Real Property

1.     Steinman Lease, being the lease granted to Cobalt Coal LLC bearing date 12 December 2012, a copy of which is included in the Disclosure Documents and

2.     Ken Energy Lease, being the lease granted to Ken Energy Corporation bearing date 1 June 2013, a copy of which is included in the Disclosure Documents,

being five tracts of land totalling approximately 5,339 acres in Dickenson County, Virginia.

15750547.3

**SCHEDULE 7**

**Permits**

1. KMH Permit, being the permit (Permit #1100822) issued to KMH Energy Corporation bearing revision approval date 16 November 2012 permitting mining operations to be conducted at the Mill Creek tract which permit also contains a refuse permit (subject to ongoing site work in accordance with the normal course of business), a copy of which which is included in the Disclosure Documents.

2. Ken Energy Permit, being the permit (Permit #1008622) issued to Ken Energy Corporation bearing approval date 30 August 2013 permitting mining operations to be conducted at the Davis tract (subject to expansion of existing permits work in accordance with the normal course of business), a copy of which is included in the Disclosure Documents.

**EXECUTED** and **DELIVERED** as a **DEED** )
by **TAILWIND CAPITAL PARTNERS, INC.** )
acting by a director in the presence of: )

Al Kroontje - Director

Witness Signature

Jana Lillies

Witness Name

1217 - 18 Ave NW
Calgary AB T2M OW3

Address

Accountant

Occupation

**EXECUTED** and **DELIVERED** as a **DEED** )
by **COBALT COAL LTD.** acting by its )
Authorized Representative in the presence )
of: )

Al Kroontje – Authorized Representative

Witness Signature

Jana Lillies

Witness Name

1217 - 18 Ave NW
Calgary AB T2M OW3

Address

Accountant

Occupation

**EXECUTED** and **DELIVERED** as a **DEED** )
by **US CARBON RESOLUTIONS** )
**CORPORATION** acting by a director in the )
presence of: )

Stephen Moscicki - Director

Witness Signature

Joe McRobert

Witness Name

16a   Grashouse lane
High Street
Wetherby   LS22 6LT

Address

Occupation

Vice President of US Carbon Resolutions Corp