# Waiver and Third Addendum to the Share Purchase Agreement

This Waiver and Third Addendum to the Share Purchase Agreement dated March 29, 2017 (the **"Waiver and Third Addendum"**).

## PARTIES

(1)  Cobalt Coal Ltd., a limited company incorporated and registered in the Province of Alberta, Canada (corporate access # 2014927764) whose registered office is at 900, 903- 8th Avenue  SW, Calgary AB T2P 0P7, as Seller (**"Cobalt** or the **"Seller"**);

(2)  Tailwind Capital Partners, Inc. a corporation incorporated and registered in the Province of Alberta, Canada (corporate access 2017738887) whose registered office is at 200, 407- 3rd Street SW, Calgary AB T2P 4Z2, as the Consenting Party  (the **"Tailwind"**);

(3)  Al Kroontje, 900, 903 8th Ave SW Calgary Alberta T2P 0P7  as a consenting party and in his capacity as the holder of the Kroontje Debt and beneficiary of the Kroontje Debenture(**"Kroontje"**); and

(4)  G.E.M. Holdings US Corporation a Delaware corporation (company number 6069115) whose registered office is 3524 Silverside Road, Suite 35B, Wilmington DW, County of New Castle, 19810-4929, USA (**"GEM"** or **"Buyer"**) as successor to US Carbon Resolutions Corporation (**"US Carbon"**).

Cobalt, Tailwind and US Carbon shall be referred to as the Initial Parties.

Cobalt, Tailwind and GEM shall be referred to as the Current Parties.

## RECITALS

WHEREAS, the Initial Parties are parties to the Share Purchase Agreement dated August 24, 2015 (the **"SPA"**) relating to the sale of all of the issued share capital of Clinchco Met Coal, Inc. (**"Clinchco"**) which Closed on December 7, 2015 with an effective date of September 1, 2015;

WHEREAS, the SPA was amended and supplemented pursuant to the Closing Addendum entered into by the Initial Parties dated December 7, 2015 (the **"Closing Addendum"**) and the Second Addendum dated March 3, 2015 (the **"Second Addendum"**);

WHEREAS the SPA, Closing Addendum and Second Addendum were novated and assigned by US Carbon to GEM pursuant to a Novation and Amending Agreement among the Initial Parties and GEM which was  effective August 31, 2016 (the **"Novation Agreement"**, and together with the SPA, Closing Addendum and Second Addendum, as amended, restated, or otherwise modified from time to time in accordance with its provisions, the **"Clinchco Acquisition Agreement"**);

WHEREAS, Seller and GEM acknowledge that US Carbon and GEM have failed to make Consideration payments on September 30, 2016, October 31, 2016, November 30, 2016, December 31, 2016, and January 31, 2017, and February 28, 2017 when due as required under the Clinchco Acquisition Agreement (the "**Past Payment Default**");

WHEREAS, GEM was served a Notice of Default pursuant to the Clinchco Acquisition Agreement on March 3, 2017 (the "**Notice of Default**") which Notice of Default provided a cure period to either make the payments referred to in the recital above  or enter into this Waiver and Third Addendum;

WHEREAS, Seller has agreed to waive the Past Payment Default and to amend the payment schedule for the remaining Consideration and Intercompany Debt (as defined in the Novation Agreement) ("**Intercompany Debt**") payments due under the Clinchco Acquisition Agreement as set out below;

WHEREAS, Section 7(b)(vi) of the Novation Agreement permits GEM to either require Seller to release the Intercompany Debt or to reduce the purchase price for the Shares under the Clinchco Acquisition Agreement by the amount of the Intercompany Debt and the Current Parties desire to record GEM's election to reduce the Consideration to be paid under Clinchco Acquisition Agreement by the amount of the Intercompany Debt, and to amend the Clinchco Acquisition Agreement (i) to provide that references to Consideration payments shall be to payments of Intercompany Debt and to the payment of the Reduced Purchase Price (as defined herein), (ii)  to reflect that Consideration payments made by GEM to Cobalt shall be allocated first to repay the Intercompany Debt  and thereafter to pay the Reduced Purchase Price for the Shares;

WHEREAS, GEM and Seller desire to make additional clarifications and amendments to the Clinchco Acquisition Agreement, including to confirm the parties' intention to require the Seller to apply all Intercompany Debt and Consideration payments it receives under the Clinchco Acquisition Agreement, first  to the Cobalt Senior Debt, and after the Cobalt Senior Debt has been repaid in full, then to the repayment of the Kroontje Debt and to provide standstill provisions in relation to the Kroontje Debt that are substantively the same as the Tailwind Standstill (as set out paragraph 2 of the Novation Agreement);

WHEREAS, Tailwind has consented to (a) the waiver of the Past Payment Default and any other default that may have arisen under the Clinchco Acquisition Agreement or in relation to the Cobalt Senior Debt and any document relating to the Cobalt Senior Debt including without limitation the Loan Agreement, Assignment, Security Documents, (b) the revised payment schedule and (c) the amendments to the Clinchco Acquisition Agreement as set out below; and

WHEREAS, Kroontje has (a) agreed not to demand or enforce the Kroontje Debt for so long as GEM is complying, subject to applicable cure and notice periods, with its obligations under the Clinchco Acquisition Agreement and this Waiver and Third Addendum; (b) agreed to release the charge over all of the Shares created by the Kroontje Debenture upon repayment of the Kroontje debt and to execute and deliver original signed discharges of the Kroontje Debenture

2

in the same form and substance as the Discharges (the "**Kroontje Discharges**") to be held in trust on the same terms as the Discharges, (c) consented to the waiver of the Past Payment Default and any other default that may have arisen under the Clinchco Acquisition Agreement, or in relation to the Kroontje Debt and Kroontje Debenture, the revised payment schedule, and to the other amendments to the Clinchco Acquisition Agreement as set out below.

NOW, THEREFORE, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Definitions</u>. Capitalized terms used and not defined in this Waiver and Third Addendum shall have the respective meanings given to them in the SPA. All amounts referenced in this agreement are US Dollars.

2.      <u>Recitals are incorporated as part of this Agreement</u>. The recitals are confirmed and form a part of this Waiver and Third Addendum.

3.      <u>Waiver</u>. As of the date of this agreement (the "**Effective Date**"), the Seller hereby waives the Past Payment Default.

4.      <u>Tailwind and Kroontje Waiver and Consent</u>.

(a)      As of the Effective Date, notwithstanding the provisions of the Clinchco Acquisition Agreement, Tailwind hereby waives any right that may have arisen (as a result of the Past Payment Default and any other default that may have arisen under the Clinchco Acquisition Agreement (prior to the date hereof) under Section 2(b) of the Novation Agreement to enforce any security or make any demand under the documents governing the Cobalt Senior Debt or any right that may have arisen as a result of any late payments by GEM or its subsidiaries or other defaults under any other lease, royalty agreement or any other indebtedness of GEM or its subsidiaries.

(b)      Tailwind consents to the following: (i) the revised payment schedule and other amendments to the Clinchco Acquisition Agreement set out in this Waiver and Third Addendum; and (ii) the waiver by Seller of the Past Payment Default and any other potential defaults that may have arisen under the Clinchco Acquisition Agreement prior to the date hereof. Tailwind confirms that the Discharges to be delivered will cover the Shares and the Remaining Shares (as defined in Section 4 of the Novation Agreement).

(c)      As of the Effective Date, notwithstanding the provisions of the Clinchco Acquisition Agreement, Kroontje hereby waives any right that may have arisen prior to the Effective Date to enforce any security or make any demand under the documents governing the Kroontje Debt and Kroontje Debenture as a result of the Past Payment Default or any late payments by GEM or its subsidiaries or other defaults under any other lease, royalty agreement or any other indebtedness of GEM or its subsidiaries.

(d)      Kroontje consents to the amendments to the Clinchco Acquisition Agreement and other agreements set out in this Waiver and Third Addendum.

5.      <u>Payment Provisions Amendments</u>.

(a)      (i) Cobalt and Tailwind acknowledge receipt of the Initial Consideration ($50,000) and monthly Consideration payments due under Schedule 2 of the SPA (as amended by Section 6(a) of the Novation Agreement) in the amount of $250,000 (in total $300,000, the "**Received Payments**"). The Received Payments shall be deemed to be applied to repayment of the Intercompany Debt which will thereby be reduced pro-tanto.

(ii) The parties acknowledge that as of the date of this agreement a total of $550,000 remains outstanding of the eight monthly $100,000 payments due under the Clinchco Acquisition Agreement. The monthly payments are referred to as the 8 Monthly Payments in the Clinchco Acquisition Agreement.

(b)      The remaining monthly payments and due dates ("**Due Dates**") shall be amended as follows:

(i)      8 Monthly Payments

| Due Date | Payment Amount |
|---|---|
| April 15, 2017 | $100,000 |
| May 15, 2017 | $100,000 |
| June 15, 2017, | $100,000 |
| July 15, 2017, | $100,000 |
| August 15, 2017 | $100,000 |
| September 15, 2017 | $50,000 |

(ii)      Additional  Monthly Payments

| Due Date | Basic Payment Amount |
|---|---|
| October 15, 2017 | $50,000 |
| November 15, 2017 | $50,000 |

| | |
|---|---|
| December 15, 2017 | $50,000 |
| January 15, 2018 | $50,000 |
| February 15, 2018 | $50,000 |
| March 15, 2018 | $50,000 |
| April 15, 2018 | $50,000 |
| May 15, 2018 | $50,000 |
| June 15, 2018 | $50,000 |
| July 15, 2018 | $50,000 |
| August 15, 2018 | $50,000 |
| September 15, 2018 | $50,000 |
| October 15, 2018 | $50,000 |
| November 15, 2018 | $50,000 |

The Additional Monthly Payments shall be a reduction in the Consideration for the Shares (as provided for herein).  If the amount of coal produced in the any month beginning November 2017 exceeds 25,000 tons, then the Basic Payment Amount listed in (ii) above for the following month shall be increased to $100,000.

      (c)     Paragraph 3 of Schedule 3 shall be deemed to be amended to reflect the revised payment schedule referred to in clauses 5(a) and 5(b) above and these amendments shall supersede any other payment provisions relating to the Initial Consideration and 8 Monthly Payments set out in the Clinchco Acquisition Agreement such that the payments required to be made shall consist of the balance of the 8 Monthly Payments and the Additional Monthly Payments and the Annual Payments (as defined below).

      (d)     The definition of "Year" in Schedule 3 of the SPA is deleted in its entirety and Schedule 3 has been amended to provide that the annual payments of either $2.5 million or $5.0 million (which amount is dependent on the previous year's total Clean Coal production quantity) shall be made annually starting on December 1, 2018 and continuing every year thereafter on December 1 of each year until the Intercompany Debt and the Reduced Purchase Price has been fully paid(each Annual Payment due date starting on December 1, 2018 being an **"Annual Payment"** due to be made on each **"Annual Payment Date"**, and together being the **"Annual Payments"**).

      (i)     The Annual Payments amount shall be determined by the quantity of Clean Coal produced between November 1 to October 31 (inclusive) in the immediately preceding year as set out in paragraphs 4 and 5 of Schedule 3 of the SPA.

      (ii)    Annual Payments shall be deemed to be applied first to the repayment of the Intercompany Debt and upon repayment in full of the Intercompany Debt, then to the payment of the Reduced Purchase Price for the Shares. For the avoidance of doubt, payments made pursuant to the 8 Monthly Payments, the Additional Monthly Payments and the Annual Payments are to be firstly applied to the repayment of Intercompany Debt and then to the payment of the Reduced Purchase Price.  Upon receipt, Seller shall immediately direct such payments first to Tailwind (until the Cobalt Senior Debt is paid in full) and thereafter to Kroontje such that payments made by Buyer shall reduce the amount of the Cobalt Senior Debt and the amount of the Kroontje Debt accordingly.

      (iii)    Tailwind and Kroontje acknowledge and agree that for purposes of this Waiver and Third Addendum, upon repayment in full of the Intercompany Debt, the Cobalt Senior Debt and the Kroontje Debt shall irrevocably be deemed to have been repaid notwithstanding that accrued interest might have caused the aggregate amount of the Cobalt Senior Debt and the Kroontje Debt to exceed the amount of the Intercompany Debt. Therefore, and for further clarity, Tailwind and Kroontje further acknowledge that (A) when Intercompany Debt payments have been directed to Tailwind sufficient to repay the Cobalt Senior Debt in full, the Cobalt Senior Debt shall be irrevocably deemed to have been repaid and the Discharges shall be released without further action, (B) when Intercompany Debt payments have been directed to Kroontje in an amount equal to $7 million (or the amount of the Intercompany debt, whichever is less), the Kroontje Discharges may be irrevocably acted upon by GEM notwithstanding that there may still be a balance outstanding on the Kroontje Debt, and (C) that Cobalt Senior Debt Documents and the Kroontje Debenture shall each be deemed amended to reflect the provisions set out in this clause 5(d)(iii) and to reflect the Tailwind Standstill (as set out Section 2 of the Novation Agreement and amended by this Third Addendum and Waiver) and Kroontje Standstill as defined herein.

      (iv)    For the avoidance of doubt, Annual Payments must be made within 30 clear Business Days of each Annual Payment Date described above, and the second line of paragraph 4 of Schedule 3 of the SPA shall be amended by replacing the words "within 30 Business Days of the end of each Year" with "within 30 clear Business Days of the Annual Payment Date".

      (v)    The proviso (in the last line) of paragraph 4 of Schedule 3 is hereby deleted in its entirety and replaced with the following: "provided always that the sum of the total aggregate Consideration to be paid for the Shares plus the Intercompany Debt shall not exceed $25 million.

    (e)    In paragraph 5 of Schedule 3 of the SPA, the number $25,850,000 is deleted each time it appears in that paragraph and is replaced with $25,000,000.

    (f)    A new paragraph 6 shall be added to Schedule 3 as follows:

"For purposes of calculating the amount due (either $2.5 million or $5.0 million) on December 1 of each Year, the amount of Clean Coal produced between November 1 to October 31 (inclusive) in the previous year shall be used."

(g)     As with all Consideration payments, the Seller shall immediately upon receipt of any Consideration Payment made pursuant to this Third Addendum use that amount first in accordance with Section 8.2.1 of the SPA to the repayment of the Cobalt Senior Debt (together with interest thereon) until the Cobalt Senior Debt (and interest thereon) has been repaid in full, and then to the repayment of the Kroontje Debt (together with interest thereon) until the Kroontje Debt has been repaid in full.

(h)     If GEM relies on providing a wire transfer confirmation for any payment required under the Clinchco Acquisition Agreement (as amended herein) and the funds represented by that wire transfer confirmation do not arrive into the Seller's account within 3 clear Business Days after the wire initiation date for any reason other than a failure of the banking system, the payment represented by that wire transfer shall be deemed not to have occurred on the due date.

(i)     Default: (i) If any of the payment obligations contained in the Clinchco Acquisition Agreement (as amended herein) (including, for sake of clarity, re-imbursment of costs Seller incurred  to cure any default provided for in clauses 10(b)(v) and (iv) hereof) have not been received within 3 clear Business Days of the due dates set out in the Clinchco Acquisition Agreement (as amended herein), subject to the next sentence, Seller may by written notice to GEM declare a default under the Clinchco Acquisition Agreement (a "**Revised Payment Terms Default**").  Seller shall not be able to declare a default if the failure of GEM to make a timely payment is the result of, caused by or arose out of or as a consequence of (A) a banking system failure, (B) delays in the banking system, (C) an error made by the bank (each an "**Excused Payment Delay**") provided that the Buyer has rectified the Excused Payment Delay by making a substitute payment in a like amount within 7 clear Business Days of the  occurrence of the Excused Payment Delay.

(ii) Upon the occurrence of a Revised Payment Terms Default which is continuing and has not been remedied or waived within 30 clear Business Days of GEM's receipt of the notice of a Revised Payment Terms Default, Seller may by written notice to GEM declare that the transactions contemplated by the Clinchco Acquisition Agreement shall be deemed to be immediately cancelled. Within 5 clear Business Days of receipt of Seller's cancellation notice GEM shall provide confirmation in writing to the Seller that either (i) it will in lieu of such cancellation pay within a further 6 months to the Seller all amounts of the Reduced Purchase Price and the Intercompany Debt that remains outstanding under the Clinchco Acquisition Agreement (as amended herein (the "**Remaining Balance**")); or (ii) immediately co-operate with Seller to cause the transfer of any and all assets transferred pursuant to the Clinchco Acquisition Agreement to be transferred back to Cobalt.  If the Buyer has elected under (i) above and the Remaining Balance has not been received by the Seller within the time permitted in (i) above, then the Buyer shall be deemed to have elected under (ii) instead.

(iii) If Seller declares a Revised Payment Default  that is not subject to an Excused Payment Delay,  in addition to the amount due the Buyer shall be required to pay Seller an additional payment equal to 5% of such amount (collectively, an "**Increased Monthly Payment**").  Buyer must

make the Increased Monthly Payment within 30 clear Business Days of GEM's receipt of the notice of a Revised Payment Terms Default.

    (i)    **"Force Majeure"** means:

        (A)    if the Clinchco Group is not able to produce coal because a force majeure clause in a lease pertaining to the Leased Real Property has been invoked;

        (B)    governmental action precludes the coal to be mined by the GEM or the Clinchco Group provided that such governmental action (i) is not caused by GEM or the Clinchco Group and (ii) is general in nature and not targeted at the specific mining operations of GEM or the Clinchco Group; or

        (C)    GEM or the Clinchco Group is unable to mine or dispose of or transport coal due to strikes, acts of war or terrorism, nuclear or natural catastrophes or acts of god, civil insurrection, interruptions, loss or malfunctions of utilities, or any other conditions beyond the control of Clinchco Group.

GEM will provide Seller with a copy of notice of force majeure referred to in clause (A) above.

    (ii)    With regards to any Monthly Payment or Additional Monthly Payment, if the Clinchco Group's mining activities related to the Leased Real Property have ceased due to Force Majeure for a period of at least two weeks in aggregate since the date on which the previous payment was made to the Seller hereunder, then the Due Date for the next Monthly Payment or Additional Payment (only) shall be postponed by the number of days on which such cessation has occurred.

    (iii)    With regards to any Annual Payment, if the Clinchco Group's mining activities related to the Leased Real Property have ceased due to Force Majeure for a period of at least 3 months in aggregate since the last payment made to the Seller hereunder, then the Annual Payment Date for the next Annual Payment (only) shall be postponed by the number of days on which such cessation has occurred.

    (iv)    Notwithstanding any other provision of this Waiver and Third Addendum or of the Clinchco Acquisition Agreement, if GEM is prevented from performing any obligation under this agreement or the Clinchco Acquisition Agreement (other than the obligation to make a Monthly Payment, a Monthly Additional Payment or an Annual Payment) as a result of Force Majeure, such obligation shall be excused during (and any time period for the performance of such obligation shall be extended by) the period of such prevention.

6.    <u>Purchase Price Reduction and repayment of Cobalt Obligations</u>

(a)  (i) Under Section 7(b)(vi) of the Novation Agreement, at the election of GEM, the Seller agreed to either release Clinchco and its Subsidiaries from any liabilities in respect of the Intercompany Debt or to reduce the Consideration paid in respect of the Shares by the amount of the Intercompany Debt.  (ii) GEM subsequently elected to reduce the maximum purchase price payable under the Clinchco Acquisition Agreement for the Shares of $25,000,000 by the amount of the Intercompany Debt, namely $7,596,605. (iii) The parties acknowledge and agree that the Received Payments ($300,000) have been allocated to reduce the amount of the Intercompany Debt, so that as of the effective date of this agreement the outstanding amount of the Intercompany Debt is $7,296,605.

(b)  (i) The parties acknowledge and agree that the maximum purchase price payable under the Clinchco Acquisition Agreement in respect of the Shares was not to exceed $25,000,000.  As a result of the reallocation of the Consideration to payment of the Intercompany Debt in the amount of $7,296,605, the remaining Consideration to be paid shall be $17,403,395 (the "**Reduced Purchase Price**").  (ii) All references in the Clinchco Acquisition Agreement and in this Waiver and Third Amendment to "purchase price for the Shares" shall be deemed to be to the Reduced Purchase Price. All references to Consideration payments in the Clinchco Acquisition Agreement and in this Waiver and Third Addendum shall refer to payments of the Intercompany Debt together with the Reduced Purchase Price for the Shares as applicable.

(c)  The "**Cobalt Obligations**" are defined as the Cobalt Senior Debt and the Kroontje Debt. Cobalt hereby agrees that upon receipt by it of any payment under the Clinchco Acquisition Agreement Cobalt shall make payments of an equivalent sum which shall be applied as follows:

firstly in reducing and extinguishing the Cobalt Senior Debt; secondly in reducing and extinguishing the Kroontje Debt.

7.  Intercompany Debt, Cobalt agreement not to enforce.

(a)  Cobalt hereby acknowledges that the Intercompany Debt shall not accrue interest and the Intercompany Debt shall only become due and payable by GEM in accordance with the following provisions.

(b)  The Intercompany Debt shall be payable prior to the Reduced Purchase Price and, for the avoidance of doubt, shall be payable as if it were Consideration in accordance with clause 5 of this Waiver and Third Addendum until such payments are completed, and then paid annually in the amount of $2.5 million or $ 5.0 million based on the amount of clean coal sales made in the previous year (from November 1 thru October 31 inclusive), as if the Intercompany Debt were treated as Consideration and paid in accordance with the payment provisions relating to the payment of the Consideration set out paragraph 4 of Schedule 3 of the SPA.

(c)  Cobalt undertakes not to make (whether pursuant to any guarantee or indemnity or otherwise and whether on the default, dissolution or insolvency of Clinchco or otherwise) any demand on  GEM, Clinchco or its subsidiaries in respect of any indebtedness (including without limitation the Intercompany Debt) owed by Clinchco to Cobalt or to enforce any security it holds over any of the assets

of Clinchco or its subsidiaries or over the Shares or the Remaining Shares prior to the payment in full of the Reduced Purchase Price provided that GEM is in compliance with its obligations as contained herein.As a result of any payment made to the Seller by way of repayment of the Intercompany Debt on behalf of Clinchco, Clinchco will be indebted to GEM in respect of the Intercompany Debt to the extent of such payment. In the event of that GEM has elected to pay the Remaining Balance and to retransfer the Clinchco Group to Cobalt under clause 5(i)(ii) hereof, the Intercompany Debt shall be forgiven.

8.   <u>Amendments</u>

   (a)   Novation Agreement Amendments

      (i)   Section 3 of the Novation Agreement is amended as follows:

      The heading of Section 3 of the Novation Agreement is deleted and replaced with

      **"Consent of Kroontje to the sale of the shares of Clinchco, Repayment of Kroontje Debt, Agreement not to enforce the Kroontje Debenture and delivery of the Kroontje Discharges".**

      (ii)   The following new sections are added after Section 3(a) of the Novation Agreement:

      "b. Following the repayment in full of the Cobalt Senior Debt, an amount equal to all Intercompany Debt and Reduced Purchase Price made to Cobalt shall be forwarded by Cobalt to Kroontje immediately on receipt and applied by Kroontje to the repayment of the Kroontje Debt (together with interest thereon if any) until the principal amount of the Kroontje Debt together with interest thereon has been repaid in full.

      c. Kroontje and Cobalt hereby acknowledge that the Kroontje Debt is subordinated to the Cobalt Senior Debt and may only be repaid following the repayment in full of the Cobalt Senior Debt.

      d. Kroontje undertakes not to make (whether pursuant to any guarantee or indemnity or otherwise and whether on the default, dissolution or insolvency of Cobalt or otherwise) any demand on the Company or its subsidiaries in respect of any indebtedness (including without limitation the Kroontje Debt) owed by Cobalt to Kroontje or to enforce any security (including without limitation any Permitted Encumbrance as defined in the Kroontje Debenture) it holds over any of the assets of Cobalt, Clinchco or its subsidiaries or over the Shares or the Remaining Shares unless:

      (i)   GEM is in material breach of its obligations under the Clinchco Acquisition Agreement or this Waiver and Third Addendum;  and

(ii)      the Seller has given notice in writing to GEM to remedy such breach in the same manner as provided for in clause 5(i)(ii) hereof; and

(iii)      GEM has failed to make payment of the sum in respect of which it is in default within a 30 clear Business Day period from the date of such notice (the "**Kroontje Standstill**").

e. Kroontje agrees to release the Charge (as defined in the Kroontje Debenture) created by the Kroontje Debenture over all of the Shares and the Remaining Shares and shall provide fully executed Kroontje Discharges within 10 days of the execution of this Agreement, such Kroontje Discharges to be held in escrow by GEM's counsel, McCarthy Denning Limited, under the trust condition that the Kroontje Discharges will not be released to GEM or acted upon until Consideration payments sufficient to pay the Kroontje Debt (plus interest accrued thereon if any) have been made.

f. At the sole discretion of GEM exercisable from time to time, Kroontje and Cobalt agree that GEM may direct any payments due to be made to the Seller instead to Kroontje and Kroontje agrees that any such payments shall be applied by Kroontje to the repayment of the Kroontje Debt (together with interest thereon, if any) until the Kroontje Debt (and interest thereon) has been repaid in full, and Seller and Kroontje agree that any such payments shall be a valid and full, proper discharge and release of any obligation of GEM or Clinchco to make payments in the same amount to the Seller.

g. Kroontje shall provide a statement of the principal amount outstanding of the Kroontje Debt (including interest thereon) within 30 days of receipt of each payment thereon and upon request by GEM.

(b)      Section 2(b) of the Novation Agreement is amended by the substitution of the following wording for the original wording of Section 2(b):

 "undertakes not to make (whether pursuant to any guarantee or indemnity or otherwise) and whether on the default, dissolution or insolvency of Cobalt or otherwise any demand on, the Company or its subsidiaries in respect of any indebtedness (including without limitation the Cobalt Senior Debt) or to enforce any security (including without limitation any Permitted Encumbrance) it holds over any of the assets of the Company or of the Subsidiaries or over the Shares or the Remaining Shares (as defined below) unless:

(i)      GEM is in material breach of its obligations under the Clinchco Acquisition Agreement and this Waiver and Third Addendum; and

(ii)      the Seller has given notice in writing to GEM to remedy such breach as provided for herein; and

(iii)     GEM has failed to make payment of the sum in respect of which it is in default within the 30 clear Business Day period from the date of such notice.

9.     <u>Other matters</u>.

    a.  Cobalt Confirmations to GEM

        i.  Cobalt confirms to GEM that Cobalt remains indebted to Ken Stanley for certain expenditures and salaries prior to the Effective Date.  Cobalt confirms that payment of that indebtedness has been postponed with the agreement of Ken Stanley (payment is to be made from the "8 Monthly Payments"); and

        ii.  Cobalt hereby confirms to GEM that (A) the amount to be paid referred to clause 9(a)(i) immediately above **is the sole responsibility of Cobalt**; (B) that Cobalt will repay those amounts from the payments received under the "8 Monthly Payments";  and (C) that GEM is in no way responsible for those sums.

        iii.  Cobalt confirms that all required tax returns have now been filed for each member of the Clinchco Group and confirms that it is solely responsible for paying any and all late fees, penalties and interest associated the tax returns.

    b.  GEM confirmations to Cobalt

        i.  GEM confirms to Cobalt as follows:

            1.  the existence within the Clinchco Acquisition Agreement of restrictions against the placing of any encumbrances whatsoever against Clinchco Met Coal, Inc. or any of its subsidiaries except for Mill Creek Mining Inc. The intent of such restriction is repeated here for the avoidance of doubt:  The SPA restricts GEM or its affiliates or officers from allowing any encumbrances to be placed against any and all of Clinchco Met Coal, Inc. ("**Clinchco**") and Cobalt Coal LLC. ("**Cobalt LLC**") and KMH Energy Inc. ("**KMH**") and Ken Energy Inc. ("**Ken Energy**").  The rationale behind the above noted restriction is that i) the assets including the Steinman Lease, the Ken Energy Lease, the Mill Creek Permit and the Davis Permit are owned within those subsidiaries; and ii) the Steinmann Lease prohibits any encumbrances to be registered against it; iii) prudent and "standard practices" dictate that actual mining operations be conducted within a separate stand-alone corporate entity other than the corporate entities that hold the leases or permits; and iv) Mill Creek Mining Corporation was set up to conduct mining operations (and transferred to GEM) in furtherance of the foregoing.

            2.  that there are no encumbrances registered against any of Clinchco, Cobalt LLC, KMH or Ken Energy as of the date hereof other than encumbrances in favour of Kroontje or Tailwind;

            3.  that the Clinchco Acquisition Agreement contains provisions that in certain circumstances the transactions contemplated by the Clinchco

Acquisition Agreement would be terminated and any and all assets transferred pursuant to the Clinchco Acquisition Agreement would be re-transferred to Cobalt. In order to ensure that such re-transfer can be effected without other consents being required (including not having to make payments to any other parties to effect such a re-transfer back to Cobalt), GEM confirms that it will not:

    a. cause there to be issued any additional shares or membership interests by any of Clinchco, Cobalt LLC, KMH or Ken Energy until the Reduced Purchase Price and the Intercompany Debt has been paid in full to Cobalt; or

    b. cause any bank or financial institution to take or register any security against any of the shares or membership interests of Clinchco, Cobalt LLC, KMH or Ken Energy without such bank or financial institution having first acknowledged and agreed (by providing written notice to Cobalt) to Cobalt's rights to re-acquire the shares or membership interests of each of Clinchco, Cobalt LLC, KMH and Ken Energy free and clear of any liens or encumbrances in the event of a default by GEM in making the Consideration payments.

4. that the Clinchco Acquisition Agreement contemplates that transfer of the additional 10 shares in the capital of Clinchco to GEM (pursuant to the Novation and Amending Agreement) is to happen within 10 days of payment of the final installment of the Reduced Purchase Price and the Intercompany Debt. Notwithstanding that Cobalt has delivered the share certificate representing the additional 10 shares to counsel to GEM (McCarty Denning), GEM acknowledges that the transfer will occur after all of the Reduced Purchase Price and the Intercompany Debt have been paid and that pending such date Cobalt will remain entitled to any dividends paid in respect of such shares (such dividends shall not be considered payment of Consideration for the Shares);

5. that GEM has no right of setoff against the Initial Consideration or the "8 Monthly Payments" or the "Additional Monthly Payments" for any breach of warranty;

6. that GEM has not identified any breaches of warranty other than:

    a. the claim by Engineering Services to pay approximately $53,000 before Engineering Services (Mike Clisso) would provide an update to the Technical Report (the "**ES Payment**"). The parties re-affirm their verbal agreement that the ES Payment would be deducted from the first payment (of either $2.5 million or $5.0 million) due on December 1, 2018 (as amended herein).

    b. Seller has informed GEM that the required US federal, state corporate tax returns were filed recently. As of the date of this

> agreement the possible penalties for the delinquent filings are not known. Cobalt reaffirms its responsibility to pay these amounts whenever such amounts are levied or assessed.
>
> c.   the existence of the "Boyd Lease" was not disclosed.  GEM waives this breach of warranty acknowledging its intent not to renew the "Boyd Lease" in favor of constructing a bypass road around the surface access granted by the "Boyd Lease".

    c.   Additional Agreements

        i.   Tailwind and Cobalt each agree that it will not amend the terms of the Cobalt Senior Debt or the documents governing the Cobalt Senior Debt.

        ii.   Kroontje and Cobalt each confirm that it will not amend the terms of the Kroontje Debt or the documents governing the Kroontje Senior Debt.

        iii.   Each of Tailwind and Cobalt shall deliver to GEM a copy of the board minutes and authorization letter, respectively, authorizing the execution and delivery of this Waiver and Third Addendum and providing the confirmation and consent to the matters contained herein.

        iv.   GEM shall deliver to Cobalt a copy of the board minutes authorizing the execution and delivery of this Waiver and Third Addendum and providing the confirmation and consent to the matters contained herein.

    d.   Participation of Kroontje in Legal Proceedings

        i.   GEM acknowledges that it requires Kroontje to be added as a signatory to the Waiver and Third Addendum as a result of Kroontje's status as a creditor of Cobalt pursuant to the Kroontje Debenture.

        ii.   GEM hereby confirms and agrees that Kroontje is acting solely as the Authorized Representative of Cobalt and Tailwind.  Provided Kroontje is not in breach of any contractual or other obligations to GEM or the Clinchco Group, GEM hereby covenants and agrees that it will not include Kroontje as a named party in any legal proceeding whatsoever related to the Clinchco Acquisition as amended by this Waiver and Third Addendum.

10.    <u>Revisions and Clarifications to the Clinchco Acquisition Agreement</u>

The parties to the Clinchco Acquisition Agreement hereby agree to the following clarifications or amendments to the Clinchco Acquisition Agreement:

a)   Clause 1.2.4 of the SPA is hereby deleted in its entirety.

b)   Each of clauses 10.2 (including sub-clauses 10.2.1 and 10.2.2 therein), 10.3 and 10.4 are deleted in their entirety and replaced with the following:

        i.   **Clause 10.2.1 is replaced to read:**  "The Buyer covenants that it shall comply with the terms of the Leased Real Property and the Permits including making of all payments (including minimum royalty payments provided for in the Leased Real Property) and Buyer confirms herein that lack of financial capacity shall not

be a valid reason for not complying with the terms of the Leased Real Property and the Permits."

ii. **Clause 10.2.2 is replaced to read**:  "In respect of the Subsidiaries that hold the Permits or the Leased Real Property, the Buyer shall not, in any circumstance, permit any Encumbrance whatsoever (other than the Permitted Encumbrance) to be placed against such Subsidiary."

iii. **Clause 10.3 is replaced to read**: "In the event that the Buyer is in material breach of any of clauses 10.1 or 10.2.1 or 10.2.2 which breach is capable of remedy (noting that lack of financial capacity shall not constitute a reason for a breach not being capable of remedy) and has not been remedied to the reasonable satisfaction of the Seller or waived within 30 clear Business Days of a notice from the Seller to the Buyer requesting such remedy and, if the Seller has decided to exercise the intercession right, notifying Buyer that the Seller intends to intercede (including the date of proposed intercession and the actions that Seller shall take if it intercedes), the Seller shall be entitled to immediately intercede in relation to such breach whereby the Seller shall use its best efforts to remedy such breach in full and shall keep the Buyer fully informed as to its progress and the fact that Seller is interceding shall not prevent Buyer from continuing to try to remedy the breach."

iv. **Clause 10.4 is replaced to read**: "In the event that the Seller becomes aware of a material breach of any of the material covenants made by the Buyer herein and the available  cure period for such breach is less than 30 days, provided that Buyer is taking all reasonable steps to cure or have the breach waived Seller may not intercede.  If, Buyer fails to cure the breach or to obtain a waiver thereof prior to 15 days before the expiration of the cure period, then on written notice to Buyer, the Seller shall be entitled to intercede immediately upon the expiration of such notice to cure such breach."

v. **Clause 10.5 is added to the SPA and shall read as follows**: "If Seller has exercised its right to intercede in accordance with this Article 10 and has remedied such breached in full, the Seller shall provide written notice to the Buyer that the Seller has interceded to cure a default in accordance with Article 10 of the SPA and the Seller shall provide the Buyer with details of the breach, the actions taken by the Seller and the actual costs incurred by the Seller to cure the breach (**"Notice of Reimbursement Costs"**)."

vi. **Clause 10.6 is added to the SPA and shall read as follows**: "If the Seller has interceded in respect of a breach and has provided the Buyer with Written Notice of Reimbursement Costs thereof, the Buyer shall have a period of 30 clear Business Days from the date that the Written Notice of Reimbursement Costs was delivered to the Buyer to re-imburse the Seller for the actual costs it incurred in curing the breach.  If the Buyer does not re-imburse the Seller within the time provided for herein, provided that Seller has remedied the breach causing the intercession in full Seller may exercise its right to cancel the

transactions contemplated by the Clinchco Acquisition Agreement in accordance with subparagraph (vii) below."

vii.    **Clause 10.7 is added to the SPA and shall read as follows:**

"**10.7 Seller's right to cancel the Transactions:**

10.7.1  If Seller notifies GEM of its intention to exercise its right to cancel the transactions contemplated by the Clinchco Acquisition Agreement and this Waiver and Third Addendum and to require GEM to transfer the Shares of the Clinchco Group back to the Seller, then at GEM's election, GEM shall have the right to (i) in lieu of making such transfer pay to the Seller within 6 months all amounts of Consideration (including the Intercompany Debt and the Reduced Purchase Price) then outstanding under the Clinchco Acquisition Agreement and this Waiver and Third Addendum or (ii) transfer the Shares back to Seller, provided that prior to any such transfer Seller shall procure the irrevocable and immediate release of any party other than a member of the Clincho Group from any guarantees or indemnities or similar liabilities given in respect of any obligation of any member of the Clincho Group with the restrictions against placing any encumbrance against any of Clinchco, Ken Energy Corporation, KMH Energy Corporation and Cobalt Coal LLC being restated here for the avoidance of doubt.

10.7.2 For the avoidance of doubt, Seller shall not be entitled to exercise its right to cancel the transactions in respect of (i) any breach of the Clinchco Acquisition Agreement and this Waiver and Third Addendum that has been cured or waived, (ii) any breach of a lease relating to the Leased Real Property or Permit that has been cured or waived, or (iii) any breach of the Clinchco Acquisition Agreement or Permit or of a lease relating to the Leased Real Property, is caused by a force majeure as that term is defined in a lease relating to the Leased Real Property or as defined in a Permit, as applicable.

10.7.3 Where GEM elects to exercise its right under clause 10.7.1(i) to accelerate the payments due to Seller under the agreement, during the 6 month period provided therein:

10.7.3.1 GEM agrees not to permit (without the consent of the Seller not to be unreasonably withheld or delayed) any member of the Clincho Group to:

10.7.3.1.1 declare or pay any dividends or distributions to shareholders (other than for the purposes for funding the payment to the Seller under clause 10.7.1); or

10.7.3.1.2 approve the award of any exceptional salary increases or special bonuses to any officer or employee;

10.7.3.2 GEM agrees not to make or approve any additional capital expenditures or incur any new obligations or liabilities against any member of the Clinchco Group without the prior written consent of Cobalt, which Cobalt shall not unreasonably withhold provided that the capital expenditure, new obligation or liability pertains to the repair or replacement of equipment required to continue mining operations.

10.7.4 Where an obligation arises under clause 10.7.1(ii) for GEM to transfer the Shares of the Clinchco Group back to the Seller:

10.7.4.1  the transfer will be achieved by the execution of a stock transfer form for the Shares and the Remaining Shares and the return of all documents, company books and other items delivered to the Buyer pursuant to the SPA and such that Cobalt shall be the owner of 100% of the shares of Clinchco; and

10.7.4.2 this obligation shall be secured by a pledge over the shares of the Clinchco Group in the form and substance to be agreed by the parties and executed within 10 days of the date of this Agreement (the "**Pledge**"). (a) The Pledge will contain provisions allowing Cobalt to appoint a receiver over the Shares of Clinchco (and its subsidiaries as necessary) and empowering such receiver to effect the transfer of the Shares of Clinchco back to Cobalt at no cost to Cobalt in accordance with clause 10.7.1(ii);  (b) The Pledge shall be released either on the date that GEM has paid in full the Intercompany Debt and the Reduced Purchase Price due under the Clinchco Acquisition Agreement or the date that GEM pays Cobalt the Remaining Balance of the Intercompany Debt and the Reduced Purchase Price as provided herein;  and (c) Cobalt shall provide a discharge relating to the pledge in substantially the same form and to be held under the same conditions as the Discharges; and

10.7.4.3 the transfer shall include the transfer of any new property or lease for property (to be acquired by GEM within an existing subsidiary of Clinchco or through a newly formed and 100% owned subsidiary of Clinchco as provided for in Article 19 hereof) adjacent to or within 1 mile of the border of the Leased Property or the property covered by the lease commonly known as the ACIN Lease and shall assist Seller in obtaining consent to a transfer if required.

c) Section 12.1 of the SPA (Assignment and Successors in Title): is amended to read: "Seller shall be entitled to assign and transfer its rights and obligations under this agreement upon written consent of the Buyer having been obtained, with such written consent not be unreasonably withheld." Seller confirms that it has no current intention to ask for such consent.

d) Section 14 of the SPA is updated to provide a new address for notice for Cobalt and Tailwind: 900, 903 – 8th Avenue SW, Calgary Alberta Canada T2P 0P7.

11.    Provision of documents.

   a.  The Buyer shall provide to the Seller, from time to time, such documents as are reasonably requested by the Buyer to confirm that no material breach in respect to the Leased Real Property or the Permits has occurred.  Included therein shall be evidence, reasonably satisfactory to the Seller, that the royalty payments (including minimum monthly royalties) due to be made by the Buyer to the Lessor pursuant to the Leased Real Property have been paid.

   b.  On request by the Seller, Buyer will confirm that the royalties required to be made pursuant to the leases over the Leased Real Property have been made.

   c.  Buyer shall immediately upon receipt  provide to the Seller a copy of any demands, notices or other correspondence received by the Buyer  that purports to place a lease over the Leased Real Property or Permit into default or cancellation.

   d.  Buyer hereby agrees to provide when requested by Seller confirmation (backed by evidence such a bank statements) that the royalties required to be made pursuant to the leases over the Leased Real Property have been made.

   e.  Buyer shall execute the letter to Steinman in the form attached hereto as Appendix "A"and deliver same to Seller upon execution of this agreement.  Seller shall be entitled to seek Steinman's consent to be added to the addressee list for any notices issued by Steinman in respect of the Cobalt Coal LLC and Ken Energy Leases.  Obtaining such consent shall be the responsibility of the Seller and the Buyer makes no warranty herein that Steinman will provide such consent.

12.    Status of Waiver.  This Waiver and Third Addendum supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the parties

13.    Effective Date. This Waiver and Third Addendum shall become effective on the date it is signed by all parties (the "**Effective Date**").

14.     Successors and Assigns. This Waiver and Third Addendum shall inure to the benefit of and be binding upon the Seller, Tailwind, Kroontje and GEM, and each of their respective successors and assigns.

15.     Governing Law. This Waiver and Third Addendum shall be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia.

16.     Counterparts and Notices. This Waiver and Third Addendum may be executed in any number of counterparts, all of which shall constitute one and the same agreement, and any party hereto may execute this Waiver and Amending Agreement by signing and delivering one or more counterparts. Delivery of an executed counterpart of this agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this agreement. Similarly, any other documents contemplated to be delivered in connection with the completion of this agreement may be provided via e mail scan which e mail scan shall be effective as delivery of an original executed document; provided that (i) the party giving notice shall within 1 day dispatch an original of such notice to the recipient by expedited courier service (or express mail) and (ii) in the case of notices to be delivered to Buyer, send a copy of such notice to Buyer's counsel, by email to Rberesford@Mccarthydenning.com.

17.      Right of Inspection. Buyer re-affirms the rights of Tailwind and Kroontje pursuant to their respective loan and security agreements (including the Kroontje Debenture) to make such inquiries and inspections of:

      a)  the corporate records of each of Clinchco and each of its subsidiaries; and

      b) the lands making up the Leased Real Premises; and

      c) supervisory staff involved with mining operations being conducted on the Leased Real Premises

upon reasonable notice having first been provided to conduct such inspections for so long as the Cobalt Senior Debt and the Kroontje Debt remain outstanding.

18.     Audit Right. In the event that the Lessor of the Leased Real Property claims a breach with respect to the quantity of coal produced and reported, or a similar dispute arises with regard to the amount of royalties owing, and the Seller provides notice to the Buyer of its intention to intercede, the Seller shall be entitled to immediately appoint an auditor to confirm the amounts owing in respect of royalties.  Such auditor shall be granted immediate access to such corporate records of GEM, Clinchco or any of Clinchco's subsidiaries that are required by the auditor, in the auditor's sole discretion, to enable the auditor to confirm the correct amounts owing.

19.     Additional Lands.

      (a)      If the Buyer acquires any additional lands or leases that lie within 5 miles of the boundary of the Leased Real Property, the Buyer shall arrange for such an acquisition to occur within either (i) an existing subsidiary of Clinchco or (ii) a newly formed, 100% owned subsidiary of Clinchco (a "**New Subsidiary**").

(b)      If a New Subsidiary is formed in accordance with the paragraph immediately above, then the restrictions against encumbering the New Subsidiary shall apply in the same manner as elsewhere provided for in this agreement and the New Subsidiary shall be an entity that is part of the "**Clinchco Group**".

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Waiver and Third Addendum as of the date first above written.

COBALT COAL LTD

By

Name: Al Kroontje
Title: Authorized Representative

TAILWIND CAPITAL PARTNERS INC.

By

Name: Al Kroontje
Title: Director

AL KROONTJE

By

G.E.M. HOLDINGS US CORPORATION

By

Name:
Title:

21

IN WITNESS WHEREOF, the parties hereto have executed this Waiver and Third Addendum as of the date first above written.

COBALT COAL LTD.

By_____

Name:
Title:

TAILWIND CAPITAL PARTNERS INC.

By_____

Name:
Title:

AL KROONTJE

By_____

Name:
Title:

G.E.M. HOLDINGS US CORPORATION

By_____

Name: STEPHEN MOSCICKI
Title: DIRECTOR.

21

## Appendix A

### <Letterhead of GEM>

March 29, 2017

Steinman Development Company

8 West King Street

Lancaster, Pennsylvania

17604

Attn: Mr. Shane Zimmerman

**RE: Cobalt Coal LLC. Lease dated December 12, 2012 and Ken Energy Lease dated June 12, 2013 granted by Steinman Development Company ("Steinman") (together, the "Leases").**

Dear Sir

Reference is made to the above captioned Leases.

Pursuant to the Waiver and Third Addendum dated March 29 , 2017, G.E.M. Holdings U.S. Corporation ("**GEM**") has granted Cobalt Coal Ltd. ("**Cobalt**") the right to seek confirmation from Steinman that upon any future notice of default or similar written advice pertaining to the Leases having been served upon GEM, that Steinman will provide a copy of such notice or similar written advice directly to the authorized representative of Cobalt at the same time.

Please accept this letter as written consent from GEM in respect of such a request to be made by Cobalt to GEM.

Yours truly,

G.E.M. Holdings U.S. Corporation


Per: _____

Name: _____